337 F.2d 962
 Joseph ALEXANDER and Daniel W. Ambrose, Respectively
President and Secretary of the Democratic Party of
the Virgin Islands, Acting on Behalf of
the Democratic Party of the
Virgin Islands, Appellees,
v.
Henrita TODMAN, Supervisor of Elections, Appellant.
Joseph ALEXANDER and Daniel W. Ambrose, Respectively
President and Secretaryof the Democratic Party of the Virgin
Islands, Acting on Behalf of theDemocratic Party of the
Virgin Islands, et al., Appellees,
v.
Henrita TODMAN, Supervisor of Elections, and Earle B.
Ottley, et al., Appellants.
 Nos. 15000, 15001.
 United States Court of Appeals Third Circuit.
 Argued Oct. 12, 1964.
Decided Oct. 21, 1964, Rehearing Denied Nov. 10, 1964.
 
 Alfred L. Scanlan, and David B. Isbell Washington, D.C. (Shea & Gardner, Covington & Burling, Washington, D.C., Antoine L. Joseph, Christiansted, St. Croix, V.I., John L. Maduro, James Bough, Charlotte Amalie, St. Thomas, V.I., on the brief), for appellants.
 William H. D. Cox, Charlote Amalie, St. Thomas, V.I. (Cox & Bornn, St. Thomas, V.I., on the brief), for appellees.
 Before FORMAN, SMITH and FREEDMAN, Circuit Judges.
 FORMAN, Circuit Judge.
 
 
 1
 This is an appeal from two cases[1] consolidated for trial producing two judgments of the United States District Court for the Virgin Islands.
 
 
 2
 The judgment in Civil No. 158, among other things, ordered appellant Henrita Todman, Supervisor of Elections in the Virgin Islands, to certify a slate of candidates to the Democratic Party's governing body, the Territorial Committee, which slate had substantially been replaced in a primary contest by a competing group of alleged Democrats led by appellants, Ottley, et al. That judgment also declared as null and void a petition filed by parties associated with appellants, Ottley, et al., registering the Democratic Party under the new Election Code. Appellant Todman was ordered to declare that petition a nullity and to remove it from her records.
 
 
 3
 In Civil No. 260, the court, among other things, enjoined appellants, Ottley, et al., from acting as or representing themselves to be, members of the Territorial Committee of the Democratic Party of the Virgin Islands and from engaging in political activities as representatives of the Democratic Party. The judgment also declared null and void any actions taken, and rules or procedures passed, by the Territorial Committee of the Democratic Party of the Virgin Islands under the leadership of the appellants.
 
 
 4
 In both actions in the District Court the defendants, now appellants in this Court, counterclaimed, seeking injunctions directing the plaintiffs-appellees and their supporters, associates, and agents to refrain from holding themselves out as the lawful governing body of the Democratic Party of the Virgin Islands. Both counterclaims were dismissed by the District Court.
 
 
 5
 Briefly, this litigation, though notably voluminous, essentially records the following pertinent facts:
 
 
 6
 Party politics in the Virgin Islands has revolved around a two-party system, the two parties of power being the Democratic Party of the Virgin Islands, on behalf of which the plaintiffs-appellees appear, and the Virgin Islands Unity Party. The former, which has been in existence for thirty years, had an organizational connection with the National Democratic Party on the continental United States, while the latter, which had been formed in 1954, had no such connection with any other continental party. Membership in both parties was organized through the use of the political 'club' system, the Virgin Islands for many years being without election code provisions governing party affiliation.
 
 
 7
 The Virgin Islands eleven-seat unicameral legislature was composed of six Unity Party Senators, four Democratic Party Senators and one Independent Senator (who has since become a Democrat), at the time the election code provisions were being considered. The present Election Code passed the aboveconstituted legislature by a strictly party vote of six to five on February 20, 1963, amendments passing on March 26, 1963.[2] The provision which has become of prime significance to this appeal, section 302, provides that any elector of the Virgin Islands, otherwise eligible, could become a member of the party of his or her choice merely by subscribing to support the policies of that party.[3]
 
 
 8
 Section 301 of the new Election Code created alternate procedures by which a political party could file or petition for recognition under the new election law, on or before May 1, 1963. Under section 301(b)[4] the name of any political party organized and functioning in the general election of 1962 could be filed by petition signed by the president and secretary of that party. Section 301(c)[5] provided that the name of any political party could also be filed by submitting a petition to the Supervisor of Elections signed by 100 or more electors of the Virgin Islands.
 
 
 9
 On April 19, 1963, pursuant to section 301(b) of the Election Code, the appellees filed a petition registering the Democratic Party of the Virgin Islands. On May 1, 1963, just prior to the deadline for filing political parties under the new code provisions, a group of 165 electors, most of whom were associated with the appellants and with former Unity Party activities, and most of whom were not enrolled Democrats at the time of the filing of their petition, also registered the Democratic Party of the Virgin Islands. Appellees, subsequent to May 1, 1963, therefore, demanded that Mrs. Todman hold a hearing under section 301(f)[6] of the Election Code, to determine which petition validly registered the Democratic Party, which request was rejected by her.
 
 
 10
 From May 1, to September 20, 1963, pursuant to section 302[7] and subsection (b)(3) of section 303[8] of the Election Code, over 10,000 voters enrolled in the Democratic Party. As the Unity Party did not register itself, there was no opportunity for the electorate to enroll in that party. Furthermore, former Unity leaders enrolled, and encouraged their followers to enroll, in the Democratic Party. At the same time, the then constituted Democratic organization was also encouraging enrollment.
 
 
 11
 Furthermore, subsequent to May 1, 1963, two separate slates of nominees for the Territorial Committee of the Democratic Party of the Virgin Islands were entered pursuant to the procedures authorized by section 303 of the Election Code. One of these slates, represented by appellees, comprised primarily of people who had been active in the Democratic clubs of the Islands, adopted the Donkey as its symbol. The second slate of candidates, represented by appellants, some of whom had been officers and active members of the Unity Party, adopted the symbol of their alleged dissolved or abandoned Unity Party, the Mortar and Pestle.
 
 
 12
 On November 1, 1963, the primary election was held and the Mortar and Pestle group won sixteen of the twenty-two seats on the Democratic Party's Territorial Committee. The Supervisor of Elections certified the twenty-two winners, although the six Donkey Democrats refused to sit as part of the newly formed Territorial Committee.
 
 
 13
 The following legal moves have arisen from the above-stated abbreviated background of this litigation:
 
 
 14
 Subsequent to the above-mentioned refusal by Mrs. Todman to hold a hearing relative to the filing of the two petitions which were accepted by her as registering the same political party, the plaintiffs-appellees, on June 12, 1963, appealed under section 301(f)[9] of the Election Code Civil No. 158, asking that the second petition registering the Virgin Islands Democratic Party be declared null and void. Mrs. Todman moved to dismiss the complaint, which motion was denied on October 31, 1963.[10] However, on September, 3, 1963, a second law suit had been filed by the plaintiffs (Civil No. 260). This time the plaintiffs applied to the District Court to preliminarily enjoin the holding of the November 1, 1963 primary election. On October 31, 1963, the District Court also denied this application. However, this second law suit was consolidated for trial with the initial one brought against Mrs. Todman, and on July 20, 1964, Judge Gordon granted plaintiffs the relief for which they asked, as noted at the outset of this opinion. Motions addressed to the District Court to stay the judgment and suspend the injunction in the consolidated cases were denied on July 27, 1964. The present appeal was taken and the motion to stay the judgments and injunctions was renewed before this Court and granted on August 5, 1964, pending an accelerated appeal.
 
 
 15
 The injunctive relief sought by the plaintiffs-appellees rests on their claim that former Unity Party partisans conspired to perpetrate a scheme of fraudulent enrollment in the Democratic Party for the sole purpose of taking over that Party. The plaintiffs sought to marshal an extensive series of facts relating to the activities of the Unity Party which, they contend, demonstrates the conspiracy and fraud.[11]
 
 
 16
 Though the defendants-appellants disclaim the charge of conspiracy and fraud, their major defenses are jurisdictional in nature. It is initially argued that the courts are merely faced with a question of who rightfully controls the Democratic Party machinery, a question political in nature and, therefore, not a case or controversy calling for application of the judicial power. Secondly, the defendants contend that the Election Code, itself, provides the exclusive test for enrollment in a party, and for candidates seeking to run in a primary election. As the statute provides the exclusive test, the courts lack jurisdiction to superimpose conditions for party membership beyond those prescribed by the Election Code, say the defendants.
 
 
 17
 As the interrelationship of both the appellants' and the appellees' arguments emerges, two issues, revolving around section 302 of the Virgin Islands Election Code appear for our determination: (1) Whether the application of section 302 raises a substantial problem of statutory construction within the judicial competence deserving of interpretation and resolution, and (2) Whether the provisions of section 302 have been abused by the alleged conspiratorial aims of the appellants herein? To these issues we now turn.
 
 
 18
 * Appellants' contention that the courts must relinquish jurisdiction in a case where there is a question of bona fide party enrollment rests both on the alleged political nature of the question and the argued non-reviewability of the statutory test of bona fides under section 302 of the Election Code. That position, when analyzed, reveals a three-pronged assault on the actions of the District Court in taking jurisdiction.
 
 
 19
 Initially, appellants are concerned that the District Court assumed jurisdiction of an issue which the Virgin Islands legislature assertedly has settled by the enactment of the new Election Code in February of 1963. Reference is made to the standards determinative of political questions as outlined by Justice Brennan in Baker v. Carr.[12] Appellants refer to the first paragraph of the following relevant excerpts from the opinion:
 
 
 20
 '* * * Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; * * * or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 
 
 21
 'Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' * * *'[13]
 
 
 22
 Contrary to the conclusion drawn by the appellants, we find in Justice Brenan's standards a determination that, for the most part, the political questions remaining in which a court must relinquish jurisdiction, relate to the separation of powers between coordinate branches of government. The aim is to keep the judiciary in equilibrium relative to other branches of government. Prevention of unnecessary conflict between the judiciary and the legislative and executive branches is the goal. No such problem presents itself here.
 
 
 23
 This court is clearly faced with, in Justice Brennan's words, a 'political case.' Appellants' contention that the present controversy represents only the 'political question' of which political faction constitutes the elected leadership of the Democratic Party of the Virgin Islands is not tenable. Issues revolving around allegations of conspiracy and fraud are to be adjudicated within the context of this 'political case.'
 
 
 24
 Secondly, appellants have contended that the courts have no jurisdiction over the application of section 302 of the Virgin Islands Election Code, on the ground that the sincerity of the pledge of appellants' party affiliation expressed pursuant to section 302 is non-reviewable. The courts are, they submit, therefore jurisdictionally barred from going behind the statutory requirement to pass judgment on the sincerity of the appellants' beliefs.[14]
 
 
 25
 Jones v. McCollister,[15] a key case relied upon by the appellants, is in no way dispositive here. Appellants properly indicate that in McCollister, the California Constitution explicitly vested in the legislature the right to determine the tests and conditions upon which electors, political parties, or organizations of electors may participate in California state elections. However, the point of contention in McCollister was in no way covered by any legislative pronouncement. Absent such, it was held that the court had no jurisdiction to create it, and the activity complained of was, therefore, determined to be presumably valid. In the instant case, there is legislation present, section 302 of the Election Code. The question then becomes whether the Court may take jurisdiction to interpret that statutory provision. On this issue, appellants' documentation sheds little light.
 
 
 26
 Section 302 of the Election Code merely directs the prospective enrollee to subscribe to the policies of the party in which the enrollment is sought. Section 303(b)(3) prescribes the mechanics of enrollment, and in this case, pursuant to that section, prospective enrollees signed a simple statement of agreement with party policies.[16] Appellants contend, in effect, that the mere subscription raises a conclusive presumption of agreement with party policies.
 
 
 27
 On the face of the statute, appellants' position appears to be supportable. Section 302 reads, in part:
 
 
 28
 'Each elector shall be eligible to enroll as a member of the recognized party of his or her choice, by subscribing to support the policies of said party.'
 
 
 29
 The statute does not require a detailed demonstration of a present intention to support the policies of the party in which enrollment is sought. A mere pledge of support is sufficient. However, as we view this provision, it is inconceivable that a legislature would pass a provision which could leave unquestioned the bona fides of the subscription. The resultant opportunity for effective encroachment on a party's integrity would be ever present. Thus, in construing section 302, we hold that a court may, at least where no effective administrative procedure exists for challenge, judge in the first instance the bona fides of an enrollee's statutory pledge of present intention to support the policies of the party in which he has enrolled.
 
 
 30
 Finally, an oblique challenge is made to a court's ability to construe a statutory provision such as is in existence here. Raising the aura of a political question, appellants make the following reference to the aforementioned case of Baker v. Carr:[17]
 
 
 31
 '* * * Prominent on the surface of any case held to involve a political question is found * * * a lack of judicially discoverable and manageable standards for resolving it; * * *.'
 
 
 32
 Though at times it may be difficult to define standards of political party policies,[18] 'political cases' in which standards assertedly exist are amenable to judicial determination. Though the parties to this litigation apparently agree that some policy standards exist, the parties are in disagreement as to what these policies of the Democratic Party of the Virgin Islands are. This conflict serves as a basis upon which this Court may reach the question of which policies, if any, have been proved, and to what extent the behavior of the defendants-appellants comports thereto. Section 302 of the Virgin Islands Election Code, is, therefore, within the judicial competence to construe.
 
 
 33
 Having considered the above arguments raised by the appellants, we conclude that jurisdiction may be assumed over the problem at hand.
 
 II
 
 34
 As will be discussed below an essential qualification of both the signatory of a nominating petition of a candidate for membership on the Territorial Committee, and of the nominee, himself, is that each must be an enrolled member of the party in which the nominee is a candidate.[19] The fundamental charge in these suits calls into question the standing of the twenty-two defendants-appellants as valid members of the Territorial Committee of the Democratic Party by virtue of the election of November 1, 1963. The reason for the attack upon their party allegiance is that the statement of enrollment of each allegedly contained a false pledge of adherence to the policies of the Democratic Party. Furthermore, it is asserted that the electors who signed their nomination petitions likewise were not members of the Democratic Party by reason of similar defective certificates of enrollment.
 
 
 35
 The appellants contend that the District Court erred in entertaining these suits because, prior to their institution, the appellees had failed to procure a resolution of the question by exhausting the administrative remedies afforded under sections 629 and 412 of the Election Code. Although the District Court did not express itself on the issue of exhaustion of statutory remedies, it was raised by both the defendant-appellant, Mrs. Todman, in her answer to the second amended complaint in Civil No. 260 and, similarly, by the other defendants in their answer to Civil No. 158.
 
 
 36
 Section 629 of the Election Code[20] provides a procedure for a recount both based on erroneous records made by election officers and on the ground that votes were cast by persons not entitled to vote. This section is directed to action which may be taken after a primary or election to test the validity of the votes cast or the records made by the election officers. Appellees could not be deprived of the right to a judicial adjudication of their pre-primary charges by a requirement that they must await the outcome of the primary and then resort only to the section 629 statutory proceeding before the institution of their suits. We cannot agree with appellants' contention in this respect.
 
 
 37
 Section 412[21] provides that the District Court may be called upon to set aside nomination petitions received and filed by the Supervisor of Elections after the examination required by section 411. The defendants-appellants' contention that plaintiffs did not, but must, exhaust this statutory remedy fails for two separate and distinct reasons.
 
 
 38
 We find that a reading of sections 108(b)[22] and 411-12 in pari materia reveals the inapplicability of the section 411 procedure under the facts of this case. The dispute falling without section 411, a resort to section 412 judicial review would be improper.
 
 
 39
 Though section 411 permits inquiry, on many grounds, into the capacity of a signatory to a nomination petition to so act, bad faith enrollment in a political party in violation of section 302 cannot serve as a ground for that challenge in this case. The procedure for the cancellation of a party enrollment on grounds of bad faith is governed by section 108(b), not effective until after the 1964 general election. Though we have indicated in this case that a court challenge is proper, the intent of the legislature apparently was to forsake an administrative challenge to the bona fides of enrollment until after the termination of the period of transition from the political club system to the new Election Code provisions. That being the case, it would be incongruous, indeed, to determine administratively that a bad faith enrollment could eliminate a signatory to a nominating petition, and thus invalidate that petition, yet, absent section 108(b), there could be no administrative challenge to that person's bona fide enrollment for purposes of cancellation of such. At least to this extent, section 411's statutory remedy does not bar this suit. Section 412, therefore, need not be exhausted, under our facts, prior to our taking jurisdiction.
 
 
 40
 Furthermore as to section 412, since the inquiry prescribed by this section is directed to be made in the District Court, the very tribunal before which the issues raised by these suits have been tried and adjudicated, to remand them for statutory resolution at this point would indeed be a useless excursion.
 
 
 41
 Under these circumstances, neither section 629 nor section 412, nor indeed section 411, furnished statutory remedies which required exhaustion by the appellees before they commenced these suits.
 
 III
 
 42
 Plaintiffs' allegations of conspiracy and fraud come down to a claim that former Unity Party adherents as a group unfaithfully certified their allegiance to the Democratic Party under section 302 of the Election Code and so manipulated their affairs that the Unity Party in fact succeeded in gaining control of the Democratic Party in an illegal manner. The abuse of section 302 being apparent, argued the plaintiffs, those individuals aligned with the Unity Party, i.e., those twenty-two candidates for the Territorial Committee of the Democratic Party on the Mortar and Pestle slate, clearly were not enrolled in the Democratic Party, for section 302's requirement of subscription to the policies of the party in which the enrollment is sought was violated. It follows therefrom that the Supervisor of Elections improperly allowed that slate to run in the Party primary and improperly certified its sixteen victorious candidates to the Territorial Committee. Furthermore, the only slate to be recognized is that of the Donkey Democrats. Acceptance of the plaintiffs' position, as reflected in the action of the District Court, results in both the abnegation of all the acts of the Territorial Committee of the Party while under the control of the Mortar and Pestle people and in the permanent injunction of this group of defendants from participation in Democratic Party activities.[23]
 
 
 43
 Reference to the background of the passage of legislation creating new mechanisms both for party enrollment and for the nomination of party candidates is of importance to the resolution of the substantive issue of conspiracy and fraud raised by defendants-appellants. Though we are particularly avoiding an entangling discussion as to the barriers, or lack of barriers to club membership which formerly characterized party politics in the Virgin Islands, it is evident that the political club system as it had existed in many states and in the Virgin Islands fostered a popular aloofness from internal political party activities.[24] Within such a political framework one of the essential political party democratizing factors is lost; popular nominations of party candidates is denied. As pointed out by V. O. Key, a leading professor of politics:
 
 
 44
 'The cliques of people who make up party organizations from time to time gain almost unlimited power in some states and cities. Such closely held power ran counter to the notions of popular democracy, and legislators set about to remedy the matter by bringing the party organization under popular control. By adoption of the direct primary, the organization was stripped of its most important function, that of nomination. The party organization itself, consisting largely of self-appointed individuals, was made in varying ways popularly elective, on the supposition that this mode of choice would make the organization responsive to the rank and file.'[25]
 
 
 45
 The changes in Virgin Island practices wrought by passage of the new Election Code in February of 1963 emphasize the popular election of party leadership, rather than the popular nomination of party candidates. The nomination of party candidates is reposed in the hands of that popularly elected party leadership.
 
 
 46
 The Virgin Islands Election Code is not dissimilar from some of our existing state election codes. Much of it has been fashioned after Pennsylvania law and, as both parties to this suit point out, Senior Judge Maris of this Circuit and the Equity Publishing Company had been instrumental in the preparation of the draft of the new Election Code, much of which was accepted intact. The legislature's desire to incorporate into the Election Code the recognized 'present intention' test of a party allegiance, rather than the recommended 'past affiliation' test, parallels the approach of many legislatures. And it is the alleged abuse of section 302's pledge of a 'present intention' to support the policies of the political party in which membership is sought that is the measure by which the basic allegations of conspiracy and fraud must be judged.
 
 
 47
 As indicated above, plaintiffs attack, as fraudulent, defendants-appellants' section 302 subscription of support for the policies of the Democratic Party of the Virgin Islands. It is claimed that the Party's integrity as a political entity has been undermined by defendants' conspiratorial acts. To be sure, the argument can not successfully be made that an election code providing for popular participation in certain fundamental political activities should open a party to bad faith incursions, the end being either the nomination of a weak candidate or the ultimate takeover of a party by a group with interests antithetical to that political institution. In the Virgin Islands, section 302 of the Election Code provides the basis for a check on such bad faith incursions.
 
 
 48
 A pledge of 'present intention' to support a party's policies under section 302 of the Election Code cannot be used, however, to insulate a political party from good faith popular participation by those who have previously not been associated with a party's internal political activities through membership in a party's political clubs. A party may not take, particularly during a transition period from a system of internal government such as a club system to one of popular participation in certain party activities, an unrealistic position as to the extent to which disagreement in certain areas between a prospective party enrollee and the party, itself, results in the failure of the applicant to meet the test of a bona fide pledge of a present intention to support the party's policies.
 
 
 49
 Practically speaking, in the United States and its territories, 'patterns of political faith consist in part simply of the absence of groups irreconcilably attached to divisive or parochial beliefs that in other countries provide bases for multi-party systems.'[26] We must not overlook the popular consensus on fundamentals that has existed and has fostered a two-party system such as has been in existence in the Virgin Islands. 'At times, it can be said, with a color of truth, that we are all liberals; at another time, it may be equally true that we are all conservatives.'[27] Therefore, Professor E. E. Robinson's characterization of the intellectual nature of a political party within the context of the two party system has a relevance not to be underestimated:
 
 
 50
 '* * * It is not concerned with matters of fact, or doctrine, or even principle, except as they bear upon the great cause for existence: success at the polls. Such organizations not only contain men of divergent views; they must also appeal to voters of differing opinions, prejudices and loyalties. It is folly to talk of finding an actual basis (for political parties) in any set of principles relating to public welfare.'[28]
 
 
 51
 Thus, Professor Key concludes that affiliation with a party is usually a matter of great informality, with a party member hewing to its principles only 'as he interprets them.'[29] It is in light of such existing political realities that the bona fides of a person's section 302 pledge must be judged.
 
 
 52
 Moving specifically to the question in issue, whether the defendants-appellants fraudulently passed themselves off as Democrats in a conspiracy to gain control of the Democratic Party of the Virgin Islands, a preliminary word must be said concerning the binding nature upon us of the District Court's findings of fact. The District Court found a number of evidentiary and mediate facts from which it found the ultimate fact that the defendants had conspired to fraudulently participate in, and gain control of, Democratic Party functionings.[30] The evidentiary facts in the record are not in dispute. The District Court's finding as to these may not be reviewed on appeal. However, the inferences drawn therefrom, the mediate facts reached, and finally the conclusion, the ultimate fact drawn from a series of evidentiary and mediate facts, are reviewable[31] and now become subject to our scrutiny.
 
 
 53
 Plaintiffs-appellees have relied on contended differences between the policies of the Democratic Party of the Virgin Islands and those views for which defendants-appellants stand, to demonstrate that the section 302 pledge of present intention to support the policies of the Democratic Party had been made in bad faith. Although vigorously advocating this position, appellees can point to no document, such as a statement of Party principles, either in the record or otherwise, which would elucidate those principles. Appellees also have failed to introduce specific evidence of the basis of defendants' disagreement with Democratic Party policies, although general evidence relative to former opposition to the Party, itself, by these defendants, was admitted. Needless to say, this factor alone is not dispositive of the issue of a bona fide pledge of a 'present intention' to support that Party's policies.
 
 
 54
 As admitted by the appellees at the oral argument herein, the only evidence in the record supporting a finding of the Democratic Party's policies, and defendants-appellants' disagreement with those policies, is testimony by one Stefanos O'Reilly, formerly the President of the Fredriksted Democratic Club in the Virgin Islands.[32] Mr. O'Reilly's statement of party principles is one to which almost anyone in the Virgin Islands could subscribe. The alleged differences between the Democratic Party's policies and those of the twenty-two defendants-appellants, as outlined by Mr. O'Reilly, falls far short of a demonstration of an antagonism based on intellectual differences between opposing groups. We hold that plaintiffs-appellees have fallen far short of sustaining the burden of proof necessary to show a policy antagonism between the Democratic Party and the defendants-appellants which would justify our concluding that a bad faith enrollment, an abuse of section 302 of the Virgin Islands Election Code, has taken place.[33]
 
 
 55
 Standing alone this would be dispositive of the issue. And when considered along with the fact that this case arises in a year of transition from the club system of party membership to the above-described system brought about by the new Election Code provisions, only a clear showing that a challenged enrollee holds basic views adverse to the policies of the party in which enrollment is sought will sustain the finding of a section 302 violation. The failure to make such a showing supports our determination that the section 302 pledge was not abused.
 
 
 56
 Offered along with the charge of fraud in the use of section 302, was the plaintiffs' contention that defendants' actions, including their subscription to the section 302 pledge of 'present intention' to support said party policies, were part of a conspiracy to assume control over the Democratic Party of the Virgin Islands.[34] 4] Defendants-appellants admit that the facts do show that they desired to become members of the Democratic Party to offer resistance to the then existing leadership of that Party. Attorney for the plaintiffs-appellees, in his opening statement at trial before the District Court indicated the basis for defendants' action, when he stated that they felt they were more 'Democrat' than the Donkey group, the Virgin Islands regular Democrats. However, the failure to show a conflict in policies between the Democratic Party and the defendants and the resulting abuse of section 302's good faith enrollment pledge therefrom, preclude the drawing of adverse inferences from defendants' admitted actions. The showing that certain vestiges of Unity Party organization may have remained[35] does not satisfactorily prove that the Unity Party never went out of existence, and was attempting a coup within the Democratic Party.
 
 
 57
 The charges of conspiracy are further blunted both by the events surrounding the party enrollment and the realities of the primary campaign. During the enrollment period both the Mortar and Pestle group and the Donkey group were actively and widely encouraging membership in the Democratic Party. It would be absurd to say that the Donkey solicitations, as a general matter, were geared towards the acquisition of good faith enrollees, while the Mortar and Pestle group, in which the twenty-two defendants were active, merely encouraged those elements whose membership was to be in bad faith for the purpose of supporting a Unity Party takeover of the Democratic Party. It is clear that general pleas for party membership were made by both factions, the result being an enrollment of over 10,000 citizens of the Virgin Islands in the Democratic Party of the Virgin Islands.
 
 
 58
 The realities of the primary election also militate against plaintiffs-appellants charge of conspiracy. Though we do not find the result of the primary election dispositive of the issues in this litigation, the victory won by the Mortar and Pestle slate certainly is a persuasive indication that extensive popular support existed for a Democratic Party under the leadership of the Mortar and Pestle group. The symbols of the competing factions were well known and, contrary to the unsupported contention by the plaintiffs- appellees, probably minimized the confusion attendant on this first primary election. This Court feels that, if anything is to be indicated by the response given the Mortar and Pestle group by the duly enrolled membership of the Democratic Party of the Virgin Islands, a mandate has been given them whatever the basis of leadership or policy on which it stands. Absent the showing of firm reasons to set aside such a popular reaction to their candidacy, the results of the primary election must stand and the judicial restraint upon their power to act must be dissolved.
 
 
 59
 As to the counterclaims of the appellants which the District Court denies in Civil No. 260, the case is replete with evidence that the appellees have continued to assert that they still constitute the only legal Territorial Committee of the Democratic Party of the Virgin Islands. Hence the District Court erred in denying the appellants injunctive relief. Indeed, necessity for restoring the status quo requires that appellants be granted the injunctions they requested.
 
 
 60
 The judgments of the District Court of the Virgin Islands entered on July 20, 1964 in Civil No. 158 and in Civil No. 260 in favor of the appellees and denying the counterclaims of the appellants are reversed, and the orders and injunctions contained in the said judgments are vacated. The cases are remanded to the District Court with instructions to issue the injunctions requested by the appellants in their counterclaims and for any other action consistent with this opinion.
 
 
 61
 FREEDMAN, Circuit Judge (concurring).
 
 
 62
 I concur in the result. For if we should undertake to review the bona fides of the electors' statement of support of the policies of the Democratic Party, then, as Judge Forman's opinion convincingly demonstrates, there is no evidence to support the charge.
 
 
 63
 I have serious doubt, however, that we need reach the factual question. The elusive conception of motive in enrolling as a member of a political party and the difficult problem of determining the principles of a political party at a given time lead me to believe that we must not accept the role of making such decisions unless there is clear statutory requirement that we do so. The New York cases to which we are referred[1] are plainly based on specific statutory provisions.[2] The New York statute confers on the chairman of the county committee of the party in which the voter enrolls the power to determine whether he is 'not in sympathy with the principles of such party' and specifically authorizes judicial review of such determination.[3] There is no such provision in the Virgin Islands Election Code. All that 302 requires is that an elector 'shall be eligible to enroll as a member of the recognized party of his or her choice, by subscribing to support the policies of said party.' This means a statement of intention to support in the future the policies of the party. It does not require past affiliation or even a declaration of past support of the policies of the party. The courts have found it difficult enough to deal with present intention as to future conduct in simple cases of contract or tort. I do not believe that it is desirable for the courts to seek to determine motive or intention and the bona fides of belief in political questions such as this, where the wide spectrum of local, national and international problems, varied and shifting as they are in their inherent nature, are involved. The intention of the Legislature to impose this responsibility on the courts does not appear. Indeed, a contrary intention may be gleaned from 108(b) of the Election Code. This section was added to the Code on February 20, 1963. Although it is not effective until after the general election in 1964, it was in existence at the time the electors were enrolled as members of the Democratic Party. It was amended on April 2, 1964, after these events. The existence of 108(b) in 1963 shows the legislative intention that a certificate of the Supervisor of Elections was to be conclusive that an elector was properly enrolled. The 1964 amendment makes this even clearer by providing that the declaration by the elector that he 'certifies in writing that he subscribes to the policies of the party with which he is enrolled at the time of said hearing' requires that the petition challenging his enrollment is to be refused. These provisions are not operative until after the 1964 general election. But since there is no provision in any other part of the Election Code on the subject, I see no reason to deal with this case as if the right of judicial review existed. In short, since a writing subscribing to the policies of the party, after the 1964 election, must result in the rejection of the challenge to the elector, I do not believe the Legislature intended that prior to 1964 the door should be open to a trial by a judge as to the sincerity with which the declaration is made.
 
 
 64
 We deal here with circumstances existing during the changeover from the former practice to that established by the new Election Code. These circumstances are unique and will not reoccur in the same form. It will be time enough to deal with similar questions if and when they arise in circumstances which require our decision. For in such a case 108(b) will be applicable and any decision we may then make will serve as a guide in the future operation of the Election Code.
 
 
 
 [1]
 Alexander v. Todman, 231 F.Supp. 365 (D.V.I.1964); Alexander v. Todman, 231 F.Supp. 368 (D.V.I.1964)
 
 
 [2]
 18 V.I. Code 1-856 (1964)
 
 
 [3]
 '302. Enrollment of party members, voting for members of first territorial committee
 'Each elector shall be eligible to enroll as a member of the recognized party of his or her choice, by subscribing to support the policies of said party. Upon enrollment each elector shall be entitled to vote for the members of the first territorial committee of such party, and to vote at any primary of such party or to be elected or serve as a party officer, or a member or officer of any party committee. The Supervisor of Elections shall prescribe the form for party enrollment of electors. Space shall be provided for the home address of the elector.' 18 V.I.Code 302 (1964).
 
 
 [4]
 '301. Procedure for recognizing political parties
 '(b) The name of any political party presently organized in the Virgin Islands which in fact supported specific candidates at the General Election held in 1962 may be filed by a simple petition to be prescribed by the Supervisor of Elections signed by the President and Secretary of said party.' 18 V.I.Code 301(b) (1964).
 
 
 [5]
 '301. Procedure for recognizing political parties
 '(c) The name of a political party may also be filed by a simple petition to be prescribed by the Supervisor of Elections and signed by not less than 100 electors of the Virgin Islands.' 18 V.I.Code 301(c) (1964).
 
 
 [6]
 '301. Procedure for recognizing political parties
 '(f) There shall be no similarity in the names of political parties which would tend to confuse or mislead the electors when voting in primaries or general elections. In cases where the same word or words, other than the words, 'Virgin Islands' appear in the petition filed for more than one political party, the Supervisor of Elections shall hold a hearing to determine which petition shall be accepted, giving due consideration to the hour each petition was filed, the number of electors signing each petition, and whether such party was officially in existence and participating in general elections in the Virgin Islands prior to the effective date of this chapter. The Supervisor of Elections shall, following such hearing, make a public announcement of his decision. * * *' 18 V.I.Code 301(f) (1964).
 
 
 [7]
 See note 3 supra
 
 
 [8]
 '303. Territorial committees; electing members of first territorial committees
 '(a) There shall be a territorial committee for each party in the territory, which shall be composed of twenty-two members as follows: four members from the district of Saint Thomas, four members from the district of Saint Croix, two members from the district of Saint John, and twelve members at large. Vacancies shall be filled according to party rules.
 '(b) The members of the first terriritoral committee shall be elected in accordance with the following procedure:
 '(1) The Supervisor of Elections shall announce that nominations for membership on the first territorial committee of each recognized political party may be filed in his office by electors who qualify according to residence and who shall subscribe to support the policies of the party of his or her choice. This announcement shall be made at the same time that the names of the recognized political parties are published in the local newspapers.
 '(2) Nominations shall be filed on a simple form prescribed by the Supervisor of Elections not later than ten days after the first date of the publication. Said form shall provide for the nomination of candidates of a full slate of twenty-two members for the first territorial committee as a unit under a single symbol designated by said slate of candidates.
 '(3) At any time up to September 20, 1963, any elector may enroll as a member of the party of his or her choice by appearing before a member of the board or the clerk and state in writing, over his signature, the political party in which he desires to enroll and that he subscribes to the policies of the said party, and the board member or clerk shall cause the enrollment of the elector's political designation to be made in the general and district registers, in accordance with the procedure set forth in subsection 108(a) of this title.
 '(4) On November 1, 1963, the polls in the Virgin Islands shall be open from 8 o'clock a.m. to 6 o'clock p.m. to allow each elector to vote for the members of the first territorial committee of said party.
 '(5) Each elector shall be entitled to vote for the twelve members at large and the four members for the district in which he or she is registered to vote.
 '(c) The ballot for the election of the members of the first territorial committee of each recognized political party shall provide for voting by a symbol for a full slate of candidates, provided for in subsection (b)(2) of this section, as a unit. Such ballot shall, however, also permit the electors to vote for candidates on two or more slates, or to insert names of candidates.
 '(d) The members of the first territorial committee shall serve until the party primaries in 1966 as provided in this title. In 1966 and thereafter the members of the territorial committee shall be elected at the primary election and shall serve for two years.' 18 V.I.Code 303 (1964).
 
 
 [9]
 '301. Procedure for recognizing political parties
 '(f) * * * Any association, club, group, organization or instrumentality whose petition is not accepted by the Supervisor of Elections may file an appeal with the District Court not later than seven days after the announcement of such decision for review of the same. Upon such appeal, the District Court may affirm, modify or reverse the decision of the Supervisor of Elections and may declare which of the original petitions filed is to be accepted.' 18 V.I.Code 301(f) (1964).
 
 
 [10]
 No findings of fact or conclusions of law were filed by the District Court
 
 
 [11]
 The trial court found, among other things, that the following facts and developments evidenced defendants' conspiracy and fraud in Civil No. 260:
 
 
 [1]
 The political philosophy of the Unity Party differed widely from that of the Democratic Party so as to be irreconcilable
 
 
 [2]
 The Unity Party desired to obtain an affiliation with a national party in the continental United States
 
 
 [3]
 On January 11, 1963, the Unity Party voted to change its name to the Virgin Islands Unity-Democratic Party. Its various affiliated clubs also changed their names accordingly
 
 
 [4]
 Unity Party leaders, on May 1, 1963, filed a petition under section 301(c) of the Election Code for the obvious purpose of registering the Unity Party as the Democratic Party
 
 
 [5]
 On the evening of May 1, 1963, a meeting of the Unity Party was called, which purpose was known only to the executive officers of that Party. At this meeting the Unity Party supposedly voted itself out of existence
 
 
 [6]
 The Unity Party filed in nomination twenty-two candidates for membership on the Territorial Committee of the Democratic Party
 
 
 [7]
 During the primary campaign the leaders of the Unity Party constantly enunciated the differences which set them apart from the Democratic Party
 
 
 [8]
 After the primary election produced a victory for the Unity slate, each group, both plaintiffs and defendants, at all times considered itself a separate and distinct entity
 
 
 [9]
 The leaders of the Unity Party, through their control over the Territorial Committee, abolished all clubs, resulting in the complete takeover by the Unity Party of the Democratic Party
 
 
 [10]
 The Unity Party's official organ, The Mortar and Pestle, has constantly emphasized the differences in policy between plaintiffs and defendants
 
 
 [11]
 Events demonstrate that the Unity Party has remained in existence after its supposed dissolution on the evening of May 1, 1963. Its checking account continues to be kept in the name of the 'Virgin Islands Unity Party,' and the Unity Party has also remained listed in the local telephone directory
 
 
 [12]
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)
 
 
 [13]
 Baker v. Carr, supra note 12, at 217, 82 S.Ct. at 710
 
 
 [14]
 Section 108(b) of the Election Code, a provision for challenge of party enrollment, discussed in the text accompanying note 22 infra, does not become effective until after the general election in 1964. Without taking a position as to our power to review a section 108(b) finding of bona fide party enrollment, suffice it to say that in our present context section 108(b) provides no basis for an argument that a statute presents the exclusive procedure by which the question of party affiliation is to be resolved. Section 108(b) reads as follows:
 '108. Change of enrollment of political party; cancellation of party enrollment
 '(b) At any time not later than the twentieth day preceding any primary, any qualified elector of the legislative district, including any watcher, may petition the board to cancel the party enrollment of any registered elector of such district who has previously enrolled as a member of a party for the purpose of voting at primary elections, setting forth, under oath, that he has probable cause to believe that such elector is no longer a member of the party with which he has been enrolled, and also setting forth that due notice of the time and place when said petition would be presented had been given to the person so registered, at least 48 hours prior to presentation of the same, by delivering a copy of the petition to him personally or by leaving it with an adult member of the family with which he resides. If, at the hearing of any such petition, the elector against whom the petition is filed appears and certifies in writing that he subscribes to the policies of the party with which he is enrolled at the time of said hearing, the petitition shall be refused, otherwise the party enrollment of such elector shall forthwith be cancelled. This subdivision shall become effective after the general election in 1964.' 18 V.I.Code 108(b) (1964).
 
 
 [15]
 159 Cal.App.2d 708, 324 P.2d 639 (1958). In this case, plaintiff sought to enjoin an adversary's political advertising, on the ground that the advertisements contained no reference to party affiliation. It was therefore contended that a defrauding of the public was in progress
 
 
 [16]
 A sample of the form used is as follows:
 'PETITION FOR ENROLLMENT AS A MEMBER OF RECOGNIZED POLITICAL PARTY
 'I, .........., a qualified elector of the Virgin Islands, residing at ..... in the legislative district of ST. CROIX, hereby subscribe to support the policies of
 Name of Party.......... and hereby petition to be enrolled as a member of the said party in accordance with the provisions of Section 302 of Title 18 of the Virgin Islands Code. Dated: ..............................
 Signature of Elector..........
 Filed: ..........
 .......... Clerk'
 
 
 [17]
 Supra note 12, at 217, 82 S.Ct. at 710
 
 
 [18]
 See note 32 infra, and accompany text
 
 
 [19]
 Under section 344 it is provided, among other things:
 '344. Nomination petitions
 '(a) * * * In no event shall any person's name be printed upon the official ballots of any party for the office of member of committee or other party officer, unless he is a duly registered and enrolled member of such party. ' (b) * * * The nomination of candidates for public office, or for election as members of committees and other party offices shall be made by separate nomination petitions in their behalf, * * * signed by duly registered and enrolled members of such party who are qualified electors of the territory, or of the legislative district, as the case may be, within which the nomination is to be made or the election is to be held. * * *' 18 V.I.Code 344(a) & (b) (1964).
 See also 18 V.I.Code 345(b)(1) and 348(b) (1964).
 
 
 [20]
 '629. Recounts; procedure; new election; appeal
 '(a) A petition for a recount may be filed by any candidate in a primary or election who believes that there has been fraud or error committed in the canvassing or return of the votes cast at such primary or election. The petition shall be filed with the board of elections of the legislative district in which the recount is requested. Such petition shall contain a statement * * * that the petitioner has reason to believe and does believe that the records or copies of records made by the election officers at one or more polling places in such district are erroneous, * * * or that votes were cast by persons not entitled to vote therein, * * *. The petition may not be filed later than seven days after the primary or election at which the votes were cast.' 18 V.I.Code 629(a) (1964).
 
 
 [21]
 The pertinent part is:
 '412. Objections to nomination petitions and papers
 'All nomination petitions and nomination papers received and filed under this chapter, and accepted after the examination required by section 411 of this title, shall be deemed to be valid, unless, within five days after the last day for filing such nomination petition or papers, a petition is presented to the district court, specifically setting forth the objections thereto, and praying that such petition or paper be set aside. * * *' 18 V.I.Code 412 (1964).
 The preceding section 411(a) reads:
 'Examination of nomination petitions, papers, and certificates; notice of defects
 '(a) The Supervisor of Elections or his deputy shall forthwith examine the nomination petitions, nomination papers or nomination certificates filed with him under this chapter and shall permit them to be examined by any interested citizen. If the identity of any signer is unknown to him or if the identity or capacity of any signer seems to him doubtful or is challenged by any citizen, the Supervisor of Elections or his deputy within three days after the close of the nomination period shall hold a public hearing in the legislative district in which the signer in question purports to reside, to which hearing such signer and any material witnesses may be summoned. The Supervisor of Elections or his deputy shall determine the signer's identity and capacity and ascertain that the candidates have been validly nominated.' 18 V.I.Code 411(a) (1964).
 
 
 [22]
 See note 14 supra
 
 
 [23]
 Although the gravamen of plaintiffs-appellees' action was fraudulent enrollment in the Democratic Party, much emphasis is unnecessarily placed on Mrs. Todman's refusal to hold a hearing under section 301(f) of the Election Code, which resulted in the Mortar and Pestle's petition of May 1, 1963 registering the Democratic Party not being reviewed. Plaintiffs alleged that such a hearing must be held unless this Court accepts the District Court's finding of illegal acts making unnecessary a resort to a section 301(f) proceeding
 It is clear, however, that the first petition registering the Democratic Party, that of the Donkey Democrats, was accepted. Plaintiffs can only argue for a section 301(f) hearing if they have been damaged in some way. No such damage appears. Plaintiffs-appellees' contention is, therefore, of no merit.
 
 
 [24]
 Though the combined membership of the political clubs of both the Unity and Democratic parties was 2300, the advent of the New Election Code procedures brought over 10,000 enrollees into the Democratic Party
 
 
 [25]
 Key, Political Parties, and Pressure Groups 379 (4th ed. 1958)
 
 
 [26]
 Id. at 230
 
 
 [27]
 Id. at 231
 
 
 [28]
 Robinson, 'The Place of Party in the Political History of the United States,' Annual Reports of the American Historical Association for the Years 1927 and 1928, p. 202 (1929) cited in Key, supra note 24, at 232
 
 
 [29]
 Key, supra note 24, at 233
 
 
 [30]
 For the pertinent findings of fact see note 11 supra
 
 
 [31]
 See Sears, Roebuck and Co. v. Johnson, 219 F.2d 590, 591 (3 Cir. 1955); Automotive Devices Co. v. Automotive Devices Co. of Pa., 292 F.2d 663, 664 (3 Cir. 1961); Surgical Supply Service, Inc. v. Adler, 321 F.2d 536, 539 (3 Cir. 1963)
 
 
 [32]
 Mr. O'Reilly's testimony concerning the policies of the Democratic Party was as follows:
 '* * * we believe and have practiced the philosophy that the policies of the Democratic Party start with its membership and works its way up to the top. We believe in the full participation of our members in the formulation of policies, and unlike the Unity Party their policies are formulated at the top. We believe in the honest disagreement between our members. The Unity Party believes there should be no disagreement-- that the majority leaders rule. We believe in honesty and integrity of our members, our candidates for the Legislature and our employees working for the government. We believe in sound fiscal responsibility. We believe that the taxpayers are entitled to one hundred percent of their tax dollars and that they should get the maximum from their taxes, and unlike the other side, they do not believe in this philosophy. This has been evidenced just one year ago in the Legislature where they have spent more money than they have earned and it was required for them to increase taxes in order for them to meet these deficiencies. We believe that if it ever became necessary-- if the leadership of my party believes-- that we should dissolve our organization, we believe we owe a responsibility to our membership to inform them and have them participate in making a statement by issuing a convention call where they can make that decision. The Unity Party has not done that. We believe in more than one party form of government. As I said in one of my television speeches, we are all aware of the dangers of a one party form of government. We have seen it in Russia, we have seen it in Cuba, we have seen it in China. And we here in the Virgin Islands don't have to guess what these dangers are. We can see them. We don't want them to happen here in the Virgin Islands. The actions of the Unity Party over the past year, as you know,-- the Democratic Party of the Virgin Islands for the past ten years has been the only effective opposition to this group and the efforts in taking over the Democratic Party was designed as an opposition and introduced into this island for one party form of government, which we all know are very dangerous. We could not stand for that. I can enumerate other differences but I think these are the basic features which make us different.' Transcript of Trial, pp. 305-07.
 
 
 [33]
 Plaintiffs-appellees have relied on a group of New York cases to persuade us of the fraud in this case. Zuckman v. Donahue, 274 App.Div. 216, 80 N.Y.S.2d 698 (3d Dept.1948), aff'd without opinion, 298 N.Y. 627, 81 N.E.2d 371 (1948) is representative of the New York approach as advanced by the plaintiffs-appellees. This case, as well as other New York cases relied upon by plaintiffs-appellees, involved conflict between the New York Democratic Party and the American Labor Party in New York. Both parties were in existence as viable and distinct entities. Both parties periodically tried to enroll members in the other. In Zuckman, former Democrats enrolled in the American Labor Party and filled out and signed a questionnaire, indicating support for American Labor Party principles. Subsequent to this, approximately 1000 of these enrollees were challenged and expelled. On appeal, the Appellate Division affirmed the expulsion as to many of those expelled, but reversed as to others. Where expulsions were upheld the Appellate Division found that substantial evidence of disagreement with American Labor Party policies was marshalled by the challenging parties and that the burden of rebutting the presumption raised by the signing of the questionnaire had been met. Where reversals were ordered, that burden had not been met
 Plaintiffs-appellees' reliance on the New York cases is, therefore, misplaced. New York courts have not affirmed expulsions absent substantial evidence which would overcome the presumption raised by the signing of the questionnaire. Such evidence has not been introduced in the instant case. Without such evidence, an abuse of the requirement of bona fides in section 302 may not be found.
 
 
 [34]
 Plaintiffs-appellees have charged that the defendants-appellants have sought to foist one-party rule upon the Virgin Islands by taking over the reins of the Democratic Party, thus eliminating all effective opposition to Unity Party control of the government. Such an unsupported contention requires little discussion. Suffice it to say that both the support given the Mortar and Pestle slate in the primary by the Democratic electorate and the creation of plaintiffs' own 'independent' slate of senatorial candidates to run in the November 3, 1964 general election, demonstrates that the Virgin Islands is not about to unwittingly succumb to one-party rule
 
 
 [35]
 See findings of fact at note 11 supra
 
 
 [1]
 Zuckman v. Donahue, 274 App.Div. 216, 80 N.Y.S.2d 698 (1948), affirmed without opinion, 298 N.Y. 627, 81 N.E.2d 371 (1948); In re Mendelsohn, 197 Misc. 993, 99 N.Y.S.2d 438 (1950), affirmed without opinion, 301 N.Y. 670, 94 N.E.2d 254 (1950)
 
 
 [2]
 New York Election Law, McKinney's Consol.Laws, c. 17, 332(2)
 
 
 [3]
 Ibid