The **REPUBLIC OF THE PHILIPPINES and The National Power Commission,** Plaintiffs,

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Westinghouse International Projects Company and Burns and Roe Enterprises, Inc., Defendants.**

Civ. No. 88–5150.

United States District Court, D. New Jersey.

Sept. 20, 1991.

As Amended Oct. 1 and Nov. 1, 1991.

---

See also 132 F.R.D. 384.

Greenbaum, Rowe, Smith, Ravin & Davis by Paul A. Rowe, Alan S. Naar, Woodbridge, N.J., and Shaw, Pittman, Potts & Trowbridge by Mark Augenblick, Washington, D.C., for plaintiffs.

Shanley & Fisher by Raymond M. Tierney, Jr., William D. Sanders, Morristown, N.J., Cravath, Swaine & Moore by Davis Boies, Richard W. Clary, New York City, and Donovan Leisure, Rogovin, Huge & Schiller by Jonathan D. Schiller, Randall L. Speck, Washington, D.C., for defendants Westinghouse Elec. Corp. and Westinghouse Intern. Projects Co.

McCarter & English by George W.C. McCarter, Jr., Newark, N.J., and Stein, Mitchell & Mezines by Glenn A. Mitchell, David U. Fierst, Washington, D.C., for defendant Burns & Roe Enterprises, Inc.

## OPINION

DEBEVOISE, District Judge.

This is an action brought by the Republic of the Philippines (the "Republic") and the National Power Corporation ("NPC"), the Philippine government agency responsible for electric power generation, against Westinghouse Electric Corporation, a Pennsylvania corporation, Westinghouse International Projects Company (herein referred to collectively as "Westinghouse") and Burns and Roe Enterprises, Inc. ("Burns & Roe"), a New Jersey corporation. Westinghouse and Burns & Roe have moved for summary judgment on Counts 3 and 8 of the complaint. For the following reasons, defendants' motion is denied.

## PROCEDURAL AND FACTUAL BACKGROUND

This case arises out of the construction of the 600 megawatt Philippines Nuclear Power Plant Unit 1 ("PNPP") in Bagac, Bataan during a ten year period commencing in 1976. The fifteen count complaint alleges breach of contract, fraud, tortious interference with fiduciary duties, negligence, civil conspiracy, RICO violations, antitrust violations and various pendent state claims.

On May 18, 1989 I filed an opinion in which I concluded that: (i) with the exception of Count 3, which alleges tortious interference with fiduciary duties, and that part of Count 8 which sets out a claim for conspiracy to interfere with fiduciary duties, all counts against Westinghouse should be stayed under section 3 of the Federal Arbitration Act pending arbitration pursuant to Article 24 of the PNPP prime contract; (ii) Count 2 against Burns & Roe should be stayed under section 3 of the same Act pending arbitration in accordance with the terms of its consulting contract with the NPC; (iii) with the exception of Count 3 and Count 8, to the extent that the latter sets out a claim for conspiracy to interfere with fiduciary duties, all other claims against Burns & Roe should, in the interests of judicial economy, be stayed pending resolution of the arbitration proceedings involving Westinghouse; and (iv) Count 3 and the related portion of Count 8 would be permitted to proceed in this Court against both Westinghouse and Burns & Roe. *See Republic of the Philippines v. Westinghouse Electric Corp.*, 714 F.Supp. 1362 (D.N.J.1989).

After issuance of the 1989 opinion NPC and Westinghouse commenced, pursued and are continuing to pursue the contract and related tort and statutory claims in arbitration proceedings in Geneva, Switzerland. Meanwhile, the Republic and defendants engaged in extensive discovery proceedings directed to the claims which continued to be litigated in this court. The essence of those claims, as illuminated by discovery, can be very simply stated.

Beginning in the summer of 1973, Westinghouse sought the award of a turnkey contract for the PNPP project, and Burns & Roe sought first a consulting contract with NPC and later the architectural and engineering subcontract to be awarded by Westinghouse. At that time, and during the ensuing years pertinent to this case, Ferdinand E. Marcos, President of the Republic of the Philippines, held ultimate authority as the ruler of the nation. Both Westinghouse and Burns & Roe concluded that they could not effectively pursue the

contracts with NPC unless they retained a special sales representative ("SSR") who had influence with the President.

Westinghouse and Burns & Roe retained Herminio T. Disini as their SSR under separate agreements. Disini was a well-known Philippine businessman and close friend of President Marcos. His wife was Mrs. Marcos' cousin and personal physician. The agreements provided for generous commissions to be paid to companies controlled by Disini.

The complaint alleges, and the facts developed on discovery substantiate, (i) that President Marcos intervened with NPC and its officials to ensure that Westinghouse received the turnkey contract, (ii) that President Marcos directed NPC to award the consulting contract to Burns & Roe and interceded with Westinghouse to grant the architectural and engineering subcontract to Burns & Roe, (iii) that during the contract negotiations President Marcos intervened with NPC to secure contract terms favorable to Westinghouse, and (iv) that from time to time during the performance of the contract President Marcos interceded with NPC on Westinghouse's behalf.

The Republic asserts that the defendants knew that to secure this favorable treatment all or a substantial part of their commission payments to Disini were paid over to President Marcos and that President Marcos was given additional financial benefits through Westinghouse's award of PNPP subcontracts to concerns in which President Marcos held an interest. In essence, the Republic claims that Westinghouse and Burns & Roe bribed the President to obtain their economic ends. Thus they caused (Count 3) and conspired to cause (Count 8) President Marcos to breach a fiduciary duty he owed to the people and to the Republic of the Philippines, by inducing him to intervene in the PNPP contracting process in derogation of the rights and interests of the Philippine people in a fair and open bidding process.

Westinghouse asserts three independent reasons to grant its motion for summary judgment. First, they contend there is no evidence of any Westinghouse bribe payments to President Marcos. Second, they argue that the civil causes of action for tortious interference with President Marcos' fiduciary duty and for conspiracy to so interfere do not exist as a matter of Philippine law. And, finally, they assert that New Jersey's six year statute of limitations is applicable to this case and bars the Republic's claims, and there are no facts to support non-application of the statute. In the alternative, Westinghouse moves for partial summary judgment limiting damages to the amount of any improper payments received by President Marcos.

The grounds for Burns & Roe's motion for summary judgment parallel those of Westinghouse: (i) There is no evidence that Burns & Roe paid a bribe to President Marcos; (ii) there is no evidence that payments to Disini caused President Marcos to use his influence to induce NPC to award the Phase I consulting contract to Burns & Roe; (iii) there is no evidence that President Marcos induced Westinghouse to award the Phase II architectural and engineering contract to Burns & Roe; (iv) the Republic's claims are barred by the applicable statute of limitations and there are no facts to support non-application of the statute; (v) the causes of action which the Republic asserts do not exist under Philippine law; and (vi) the action is barred by the act of state doctrine.

For the reasons which will be set forth below, I conclude: (i) There remain factual issues whether Westinghouse and Burns & Roe paid bribes to President Marcos and whether these bribes induced President Marcos to intervene in the administration of the PNPP in order to obtain favorable treatment for Westinghouse and Burns & Roe. (ii) The Republic's claims are not barred by the applicable statute of limitations, nor by the doctrines of laches or estoppel. (iii) The Republic has stated a cognizable cause of action under Philippine law, and neither the political question doctrine nor the act of state doctrine prevents this Court from hearing the Republic's claims. (iv) There is no basis for limiting damages to the amount of the bribes received by President Marcos. Therefore, I

deny defendants' summary judgment motion in its entirety.

## DISCUSSION

### I. EVIDENCE OF BRIBES.

■ The standards for summary judgment are well established. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Lujan v. National Wildlife Federation*, ―― U.S. ――, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Summary judgment

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact.

*Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is appropriate where no "fair-minded jury could return a verdict for the plaintiff on the evidence presented," *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. An issue of fact cannot be created by affidavits which are made on the basis of beliefs or personal opinions as distinguished from affidavits which are made on personal knowledge and set forth facts which would be admissible in evidence. Fed.R.Civ.P. 56(e); *Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir.1990). On the other hand, in considering a motion for summary judgment, the Court must credit the evidence of the non-movant, and draw all reasonable inferences in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514.

Before addressing Westinghouse's and Burns & Roe's reasons for arguing that there are no factual issues pertaining to the giving of bribes, it would be useful to provide a brief summary of the events in the context of which the alleged bribes were made.

In August 1973 President Marcos directed that a nuclear power plant be constructed. He designated the NPC as the utility responsible for the project. NPC had no prior experience with nuclear power and decided to hire a consulting engineering firm to advise it in connection with the contracting and ensuing phases of the project.

President Marcos had declared martial law in 1972 and thereafter ruled the Philippines for the next fourteen years, arrogating both executive and legislative powers to himself. On January 22, 1974, he issued Presidential Decree No. 380, placing the NPC directly under the control of the Office of the President. He, therefore, was the ultimate decision maker for the award of the PNPP contracts.

Recognizing President Marcos' decisive role in the PNPP project, Westinghouse sought an SSR who would have access to him. It selected Disini for this purpose and entered into a contract with his corporation, Herdis Management and Investment Corporation ("Herdis"). The initial SSR agreement with Herdis provided for compensation of three percent of the price "to be received by Westinghouse," with an initial payment of $2 million when Westinghouse received the down payment (of at least 10%), payment of $1 million a year later, payment of $1 million a year after that, and the remaining to be paid "as a percentage of the remaining payments to be received by Westinghouse." In addition Westinghouse agreed to pay a commission of ½% of United States-supplied goods and services to another entity—Asia Industries, a Herdis subsidiary.

There is very extensive evidence concerning the negotiations between NPC and Westinghouse. Westinghouse marshals this evidence to demonstrate strenuous, arms length bargaining which ultimately led to the award of a turnkey contract to it. The Republic marshals this evidence to demonstrate futile efforts by NPC to obtain sound contract provisions, efforts which were nullified at every turn by President Marcos who intervened continually to deliver to Westinghouse a contract satisfactory to it. There is no need to analyze this evidence in depth. Suffice it to say, there is a factual issue which precludes rejection at this point of the Republic's version of events. For the purposes of the motion for summary judgment I conclude that a reasonable jury could find that Westinghouse received the turnkey contract and favorable contract terms by reason of President Marcos' directions to the NPC.

Burns & Roe had a relationship with Disini similar to that of Westinghouse. It agreed to pay commissions to Disini via Technosphere Consultants Group, Inc., another Herdis subsidiary. The Republic contends, and it has assembled evidence tending to show, (i) that as a first step Burns & Roe sought the Phase I contract for consulting services to assist NPC in site selection studies, preparation of bid specifications for the project, and evaluation of supplier proposals; (ii) that by letter dated February 8, 1974 NPC awarded the Phase I contract to Ebasco Services, Inc.; (iii) that Burns & Roe entered into discussions with Disini, ultimately agreeing to pay him 10% of the value of the consulting contract and 10% of the architectural and engineering contract which it expected to obtain from Westinghouse; (iv) that Disini delivered to President Marcos an "Aide Memoire" prepared by Burns & Roe and Westinghouse personnel urging that the Phase I contract be awarded to Burns & Roe; and (v) that President Marcos directed NPC to enter into the Phase I contract with Burns & Roe. NPC rescinded the award to Ebasco and gave the Phase I contract to Burns & Roe.

Compared to the architectural and engineering subcontract the Phase I contract was a minor piece of business. But the evidence suggests a finding that it was Burns & Roe's intention from the outset to give up the Phase I contract and take over the architectural and engineering subcontract. There is evidence to support a finding that President Marcos brought pressure to bear upon Westinghouse to give the architectural and engineering subcontract to Burns & Roe.

There is evidence to show that Westinghouse paid approximately $14.3 million to Disini's company, Herdis, periodically in varying amounts from September 1976 to February 1985. At least one payment in excess of $800,000 still remains to be paid by Westinghouse to Herdis. The payments were kept off the Herdis books and were paid into various numbered accounts in Switzerland, Singapore and elsewhere. Westinghouse also paid more than $2.9 million from 1976 to 1983 to Asia Industries, a Herdis subsidiary.

Burns & Roe made payments of approximately $2.2 million to Technosphere Consultants Group, Inc. ("Technosphere"), another Herdis subsidiary. These payments were made during the period 1974 to 1980. There is evidence suggesting that they were diverted from Technosphere to numbered accounts in Swiss banks. Burns & Roe sent the checks to Switzerland, but also prepared and sent spurious cover letters purporting to send the payments to Technosphere in the Philippines.

It is the Republic's contention, of course, that these payments were remitted in whole or substantial part to President Marcos or his designee in exchange for his intervention on behalf of Burns & Roe and Westinghouse. The payment of these bribes in exchange for President Marcos' intervention in the PNPP project is at the heart of the Republic's Count 3 and Count 8 charges.

Burns & Roe and Westinghouse do not admit, and in fact strongly deny, that it was ever their intent that the payments to Disini's companies were to buy President Marcos' influence. However, they do not urge for summary judgment purposes that

there is no evidence of such intent. That is prudent strategy because there is ample evidence that both Burns & Roe and Westinghouse believed that President Marcos would dictate who was awarded the contracts and that payments to him through an intermediary would be necessary to secure the contracts. There is ample evidence that Burns & Roe and Westinghouse retained Disini for the purpose of obtaining President Marcos' favorable attention and that both companies expected that the payments to Disini would, in whole or in part, be passed on to or for the benefit of the President.

Whatever the intent, however, Westinghouse and Burns & Roe urge that there is absolutely no admissible evidence that President Marcos received any bribe payments, and that all the admissible evidence is to the contrary.

Westinghouse quotes the testimony or affidavits of a number of witnesses. Rolando Gapud, once the President's personal financial advisor, has listed all the companies in which President Marcos had an ownership interest. Neither Herdis nor Asia Industries were on the list. Rudolfo Jacob, President of Herdis from 1975 to 1982, denies that Herdis made any improper payments to any government officials in connection with the PNPP. Jesus Vergara, President of Asia Industries, denies that his companies involved in PNPP had made improper payments to anyone. Other Disini associates have testified that President Marcos had no ownership interest in Herdis and was not receiving payments in connection with PNPP.

Alejandro Melchor, President Marcos' Executive Secretary, testified that he had no knowledge of any business relationship between Disini and President Marcos and that he had no knowledge that any commissions paid to Herdis or Asia Industries were paid to the President. Other former Philippine or NPC officials testified to similar effect.

Westinghouse's employees involved in the PNPP project denied having any reason to believe that Westinghouse money was paid over to President Marcos on account of the project. Westinghouse asserts that there is no documentary evidence of any such payments. Westinghouse, quite properly, requests the Court to disregard the testimony of various witnesses who believed, understood or were of the opinion that the Disini commission payments were passed on to President Marcos. Such testimony, quite obviously, would not be admissible evidence that President Marcos actually received payments.

Burns & Roe's arguments are to the same effect. It contends that there is no evidence that President Marcos ever received the payments which it made to Disini's company in the form of commissions.

Notwithstanding the forceful and articulate manner in which Westinghouse and Burns & Roe present their argument, I find that there is ample evidence to permit a reasonable jury to find that the Disini commissions were intended to be paid in whole or in part to President Marcos and were in fact paid in whole or in part to him or upon his direction. It is not necessary that the Republic produce a witness who actually saw the payments being made, or to whom President Marcos acknowledged receipt of the bribes, or to whom Disini admitted paying bribes to the President. *See United States v. Mammoth Oil Co.*, 14 F.2d 705, 717, 731 (8th Cir.1926), *aff'd*, 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137 (1927) (unnecessary to have direct evidence of bribes); *see also United States v. Sutherland*, 656 F.2d 1181, 1186–89 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). Rather the facts which the Republic has assembled permit a reasonable inference that in one way or another the Disini commissions were transmitted to President Marcos or disposed of on his instructions in exchange for actions on behalf of Westinghouse and Burns & Roe.[1]

1. Because I conclude that there is sufficient evidence to create a factual issue whether or not the commission payments were transmitted to

President Marcos or disposed of at his direction, I need not consider the Republic's additional argument, namely, that under applicable Philip-

First, there is evidence that by decree President Marcos had placed NPC directly under the control of his office.

Second, there is evidence that both Westinghouse and Burns & Roe believed that in order to obtain the PNPP contracts they sought, they would need the assistance of a powerful person having influence with President Marcos. Disini was the person they selected to fill that role and there is evidence that both Westinghouse and Burns & Roe expected and knew that payments they made to Disini would be passed on in whole or in part to the President or would otherwise be at his disposal.

Third, there is evidence that Disini communicated with President Marcos and obtained from him authority to handle the PNPP contracts.

Fourth, it is undisputed that both Westinghouse and Burns & Roe entered into commission agreements with companies controlled by Disini pursuant to which millions of dollars were paid to those companies. There is evidence that the amounts of the payments were far in excess of any amounts which similarly situated companies would normally pay in such circumstances and that the payments were not made in the normal course but were transmitted to Swiss and other foreign bank accounts and were disguised both by Herdis and Technosphere and by Westinghouse and Burns & Roe.

Fifth, there is evidence that President Marcos personally intervened in the PNPP project to ensure that Burns & Roe obtained the Phase I contract, to ensure that Westinghouse obtained the turnkey contract and that the terms were satisfactory to Westinghouse, to ensure that Burns & Roe obtained the architectural and engineering contract from Westinghouse, and to further Westinghouse's position from time to time during the course of the work on the project.

Sixth, there is evidence that both Westinghouse and Burns & Roe took steps to cover up the payments, suggesting guilty minds. Westinghouse sought to conceal the commission payments from NPC; Burns & Roe sought to withhold evidence of President Marcos' role in reversing the Phase I contract award. After 1977 reports in the press suggested that Westinghouse may have made improper payments to obtain the PNPP contract, Westinghouse burned the files in Manila relating to the procurement of the contract. Other records were destroyed and other efforts were made to avoid discovery of the Herdis agreement. President Marcos himself gave false and misleading accounts about the contracts, Disini and his companies.

This evidence is more than sufficient to create a jury question. It is sufficient to support a finding that President Marcos himself received a substantial portion of the Disini commissions, either directly or indirectly.

It is unnecessary to discuss at this time the evidence concerning the Republic's charge that additional consideration transferred to President Marcos consisted of the award of subcontracts to corporations in which he had an interest. Count 3 withstands a summary judgment motion simply on the basis of the Disini commission payments. Nor is it necessary to discuss at this time the evidence suggesting that there was a conspiracy between Westinghouse, Burns & Roe and Disini to bribe President Marcos. Suffice it to say that there is sufficient evidence of conspiracy to withstand a motion for summary judgment on Count 8. I need not address the evidential implications of a conspiracy finding, i.e., the extent to which the words and deeds of one co-conspirator can be used against the others. There is sufficient independent evidence admissible against Westinghouse and Burns & Roe individually to preclude a grant of summary judgment in their favor on the bribery issue.

## II. THE TIMELINESS OF PLAINTIFF'S CLAIMS.

Defendants contend that New Jersey's six-year statute of limitations applies to the Republic's claims, that under the statute the claims are untimely, and that there is

pine law it is unnecessary to the claim that the

public official actually receive the bribe money.

no basis for tolling the statute in this case. Defendants also argue that the Republic's claims are barred by laches and estoppel.

I conclude that Philippine law should govern the statute of limitations in this case, and consequently the Republic's claims are clearly timely. Even if New Jersey's statute of limitations applied, however, I conclude that the Republic's claims would still be timely, even without the benefit of any tolling to which they may be entitled. Finally, I conclude that defendants' arguments concerning laches and estoppel are without merit.

■■■ Beginning with the choice of law question, a federal court hearing a case pursuant to its diversity jurisdiction must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *see also Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir.1988). As the Appellate Division of the New Jersey Superior Court recently noted when surveying the historical development of choice of law principles in New Jersey contract cases, "ritualistic concepts" have been abandoned in favor of a "most significant relationship" standard, "under which choice-of-law 'assessment[s] encompass an evaluation of important contacts as well as consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.' " *Bell v. Merchants & Businessmen's Mutual Insurance Co.*, 241 N.J.Super. 557, 562, 575 A.2d 878 (App.Div. 1990) (quoting *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 208 N.J.Super. 666, 673, 506 A.2d 817 (App.Div.1986)). This evolution, the court noted, "parallels that in other areas of the law in which our Supreme Court has eschewed slavish devotion to rigid principles in favor of a more realistic governmental interest analysis in choice-of-law decisions." *Bell*, 241 N.J.Super. at 562, 575 A.2d 878.

Originally, this evolution was confined to choice of law principles applicable to substantive, rather than procedural law, on the theory that it "would be an impossible task for the court of such a state to conform to procedural methods and diversities of the state whose substantive law is to be applied." *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 136, 305 A.2d 412 (1973). As a result, it had long been the common law conflict rule that the statute of limitations, ordinarily a matter of procedure, should be controlled by the law of the forum, rather than by the law of the state whose substantive law governs the action. *Id.* at 135, 305 A.2d 412.

All this changed in *Heavner*. In that case, the court noted the growing criticism of the rule which always applied the law of the forum state to determine the statute of limitations, recognizing its "fundamental illogic and unsoundness." *Id.* at 137, 305 A.2d 412. The court provided an extensive and scholarly discussion, both of relevant case law from other jurisdictions as well as the views of various commentators, who suggested a range of possible solutions. One commentator, for instance, argued that it "would have made better logic if the limitations rule of the state whose substantive law is chosen to govern the right were deemed substantive also," so that both would apply. *Id.*

But while taking account of these wide ranging views, the *Heavner* court chose only to focus on a specific issue, namely, the case where a plaintiff brings suit in New Jersey only as a type of forum shopping, to take advantage of the longer statute of limitations New Jersey has to offer. *See id.* at 140, 305 A.2d 412. Limiting itself to this problem, the court announced a modification in the old conflicts rule as follows:

> We are convinced the time has come, for the reasons previously outlined, to discard the mechanical rule that the limitations law of this state must be employed in every suit on a foreign cause of action. *We need go no further now* than to say that when the cause of action arises in another state, the parties are all present in and amenable to the jurisdiction of that state, New Jersey has no substantial interest in the matter, the substantive law of the foreign state is to be applied, and its limitation period has

expired at the time suit is commenced here, New Jersey will hold the suit barred. In essence, we will "borrow" the limitations law of the foreign state. We presently restrict our conclusion to the factual pattern identical with or akin to that in the case before us, for there may well be situations involving significant interests of this state where it would be inequitable or unjust to apply the concept we here espouse.

*Heavner,* 63 N.J. at 140–41, 305 A.2d 412.

Defendants contend that the only possible meaning of this passage is that a foreign statute of limitations will *only* be applied if it is shorter than the New Jersey statute; otherwise, they argue, the New Jersey statute of limitations should apply. A review of both federal and state case law subsequent to *Heavner,* however, reveals that it has been read to require a flexible approach, which focuses primarily on the interests of the competing forums.[2]

Shortly after *Heavner* was decided, the Third Circuit had an opportunity to apply it in a diversity case. *See Henry v. Richardson–Merrell, Inc.,* 508 F.2d 28 (3d Cir. 1975). The Third Circuit in *Henry* read *Heavner* to mean that "the New Jersey Supreme Court abandoned the mechanistic application of the forum statute of limitation *in cases where a foreign substantive law was chosen." Id.* at 32 (emphasis added). The Third Circuit emphasized its view that *Heavner* "eschews *all* mechanistic rules." *Id.* at 32 n. 9 (emphasis in original). The Third Circuit held that because whether foreign substantive applied or not would affect whether the foreign statute of limitations should also apply, "New Jersey choice of law rules therefore *require* a determination of which law will govern the merits of the case." *Id.* at 32 (emphasis in original).

In a subsequent decision, the Third Circuit revisited the *Heavner* issue, and held that it was necessary to consider, and balance, *all* of the factors described in the *Heavner* opinion.

This court has interpreted *Heavner* as adopting the "governmental interest approach" to resolving conflicts of law as to statutes of limitation. *Henry v. Richardson–Merrell, Inc.,* 508 F.2d 28, 32 (3d Cir.1975). That approach involves two steps: "The court determines first the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts between the parties and each related jurisdiction." *Id.* Quite clearly, this second step requires the balancing of various factual contacts. *Id.* at 35. According to *Henry,* the *Heavner* court did not perform the first step—policy examination. But it did make clear, by reference to the five factors listed in the paragraph quoted above, that "there were insufficient factual contacts to justify application of New Jersey law." 508 F.2d at 33. In other words, the *Henry* court read *Heavner* as establishing New Jersey's method of performing the second step in the governmental interest analysis. *It requires the balancing of all five factors enumerated in the quoted passage: (1) where the cause of action arose; (2) amenability to suit in other states; (3) the substantial interest, if any, of New Jersey in the suit; (4) which state's substantive law will apply; and (5) whether the other state's limitations statute has run.*

*Allen v. Volkswagen of America, Inc.,* 555 F.2d 361, 362–63 (3d Cir.1977) (per curiam) (emphasis added). Again, to emphasize the point, the court in *Allen* stated that under its reading of *Heavner,* all five factors are

2. The only other New Jersey Supreme Court decision which addresses this issue simply restates the *Heavner* factors. *See O'Keeffe v. Snyder,* 83 N.J. 478, 490, 416 A.2d 862 (1980). Defendants emphasize that in *O'Keeffe* the court described *Heavner* as providing only a "limited and special exception" to the general rule of applying the forum state's statute of limitations. *See id.* at 490, 416 A.2d 862. However, *O'Keeffe* is rather unhelpful to defendants' position, for in that case the court stated that the choice of law issue could be reconsidered on remand by the lower court, even though the action would have been timely commenced under the foreign state's statute of limitations. *Id.* If defendants were correct that one applies the foreign state's law only where it would render the claim untimely, there would have been nothing to reconsider on remand.

"determinations to be reached independently and balanced against one another." *Id.* at 363. In fact, the Third Circuit criticized the district court for doing precisely what defendants urge here, namely, considering only some of the relevant factors. *See id.*[3]

In the later decision of *Schum v. Bailey,* 578 F.2d 493 (3d Cir.1978), the Third Circuit continued to apply a flexible governmental interests approach for making a choice of law determination with respect to a statute of limitations. The court explained that "[w]e glean from *Heavner* that *the critical determination* underlying the 'borrowing' of a foreign statute of limitations is a determination as to whether a foreign substantive law is to be applied." *Schum,* 578 F.2d at 495 (emphasis added). The court then proceeded to evaluate the contacts between the lawsuit and the different forums, based on the policy interests in a tort context "as consisting primarily of compensation and deterrence." *Id.* at 496.[4] Because the court concluded, based on a governmental interests analysis, that New Jersey substantive law would apply, it found that the New Jersey statute of limitations would apply as well. *See id.* at 497–98. The Third Circuit continued to follow this governmental interest approach to conflicts questions for statutes of limitation in *Dent v. Cunningham,* 786 F.2d 173, 176–77 (3d Cir.1986); *see also Thompson v. Yue,* 426 F.Supp. 853, 855 (D.N.J.1977) ("[i]f a court concludes that New Jersey substantive law will not govern the action, the Third Circuit concluded that '*Heavner* requires borrowing of the foreign limitation period' ") (quoting *Henry,* 508 F.2d at 37).

New Jersey state courts have followed an identical interpretation of *Heavner.* Thus, in *Pine v. Eli Lilly & Co.,* 201 N.J.Super. 186, 492 A.2d 1079 (App.Div. 1985), the Appellate Division stated:

We glean from *Heavner* that the underlying analysis of whether New Jersey should apply its limitations statute or that of the foreign state is essentially akin to the "governmental interest" test in resolving choice of substantive law issues.... This approach requires a two-step analysis in resolving the choice of law issue: a determination first of the governmental policies, as expressed by the laws of each related jurisdiction, and second of the factual contacts the controversy and parties have with each related jurisdiction.

*Pine,* 201 N.J.Super. at 191–92, 492 A.2d 1079. The Appellate Division emphasized that "the qualitative nature of contacts is considered so that only contacts which are likely to promote valid state policies are considered relevant." *Id.* at 192, 492 A.2d 1079. Like the Third Circuit, the Appellate Division stated that in the tort context, the two relevant policy considerations were compensation and deterrence.

 Therefore, it is plain that defendants are simply wrong to argue for a mechanical rule where the foreign statute of limitations is applied only when it has expired. Rather, the case law demands that we consider a number of factors, as they relate to the relevant policy interests of the competing jurisdictions.

 There can be little dispute that this approach requires the application of the Philippine statute of limitations in this case. First, the action arose in the Philippines, and clearly that jurisdiction has the only significant contacts with this case for purposes of the choice of law analysis. Because the plaintiff is the Republic of the Philippines, obviously New Jersey can have no policy interest in providing compensation, as it would in a case where the plaintiff is a New Jersey domiciliary. *Compare*

---

**3.** Also relevant to defendants' suggestions that I ignore what they describe as Third Circuit "dicta," the court in *Allen* pointedly reminded the district court that it was obliged to follow its reading of New Jersey law. "Even if the *Henry* court's interpretation of *Heavner* were incorrect, the district court could not disregard the clear holding of this court." *Allen,* 555 F.2d at 363 n. 3.

**4.** The court rejected the notion that one looks to the policy interests behind the respective statutes of limitation; rather, one should look to the interests behind the relevant substantive law. *See Schum,* 578 F.2d at 497 n. 4; *see also Henry,* 508 F.2d at 32 n. 10.

*Pine,* 201 N.J.Super. at 193–95, 492 A.2d 1079. Similarly, although one of the defendants, Burns & Roe, is a New Jersey corporation, this does not implicate New Jersey's interest in deterrence, which "is ordinarily associated 'with the sovereignty in which past misconduct took place and in which future misconduct may occur.'" *Pine,* 201 N.J.Super. at 192, 492 A.2d 1079 (quoting *Schum v. Bailey, supra,* 578 F.2d at 501). Obviously, given the nature of the claims in this case (related to the bribery of a public official), the Philippines has the primary policy interest in deterrence. The mere fact of Burns & Roe's "incorporation and presence in New Jersey cannot be said, without more, to outweigh [the Philippines'] substantial involvement with the parties and the [tort] in question." *Allen,* 555 F.2d at 364. Thus, New Jersey has no interest in this suit, let alone a substantial one.[5] The fact that the parties agree that Philippine substantive law must apply to the Republic's claims also strongly favors application of the Philippine statute of limitations; the Third Circuit has described this as the "critical determination." *Schum v. Bailey,* 578 F.2d at 495. The remaining two factors are important only where the plaintiff is engaged in forum shopping to take advantage of New Jersey's statute of limitations, which is clearly not occurring in this case.[6] Therefore, all relevant factors favor the application of Philippine law in this case.

Once Philippine law is applied, it is undisputed that the Republic's claims are timely. First, under Article 1108(4) of the Civil Code, the limitations period does not run against the Republic at all. *See* Affidavit of J. Cezar S. Sangco, ¶ 12 (Aug. 9, 1989) ("Sangco Aff."). Defendants do not challenge this point. Therefore, under any circumstances the Republic's claims would be timely. But even if the Republic were

treated as a private party, its claims would still be timely. Under the applicable statutory provisions, *see* Revised Penal Code ("RPC") Art. 90, the statute of limitations for the Republic's claims would be ten (10) years. *See* Sangco Aff., ¶¶ 14, 29. Likewise, under RPC Art. 91, the cause of action would accrue, and the period would begin to run, no sooner than the discovery of the wrongdoing. The defendants have presented no legal authority to the contrary. As they concede, pursuant to tolling agreements signed by the parties, the complaint in this action is treated as if it were filed on December 1, 1987. *See* Westinghouse Br., at 77. And, while the defendants' theory of accrual is not a model of clarity, at the earliest the claims could not have accrued before December 19, 1977, when defendants contend suspicion should have first arisen as a result of a newspaper article regarding the PNPP contract in the *Washington Post. See* Westinghouse Br., at 29. Therefore, even under the scenario most favorable to defendants' position, under Philippine law the Republic's claims were timely filed within the applicable ten year period.

Moreover, even if, contrary to the choice of law analysis outlined above, one were to apply the six-year New Jersey statute of limitations, the Republic's claims would still be timely, even without the aid of New Jersey's discovery rule or any rule of equitable tolling, to which the Republic may well be entitled. As the Republic points out, and as defendants agree, under New Jersey law the cause of action does not accrue until the date of the last overt act causing damage. *See Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.,* 153 F.Supp. 589, 593 (D.N.J.1957), *aff'd,* 307 F.2d 210 (3d Cir.1962), *cert. denied,* 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963).

---

5. As I have already pointed out, New Jersey's interest in the suit is examined from a standpoint of substantive law, and *not* in view of its interest in enforcing its own statute of limitations. *See supra* note 4.

6. Thus, whether defendants would be amenable to suit in the jurisdiction where the claim arose would matter in a forum shopping context, because then it would be fair to insist that the

plaintiff be bound by the (shorter) foreign statute of limitations. Likewise, if the foreign jurisdiction's statute of limitations has run, this favors application of that jurisdiction's statute as a means to deter forum shopping. Obviously, where the foreign statute of limitations is longer, as in this case, neither of these anti-forum shopping devices comes into play.

Here, defendants continued to work on the PNPP contract and receive payments for their work through 1985. Moreover, Westinghouse continued to make commission payments to Disini (what the Republic claims were actually bribes to President Marcos) through February 1985 (indeed, one $800,000 payment remains outstanding). As the Fifth Circuit held in an analogous context, even though a contract is entered into outside the limitations period, because contract payments are within the limitations period, the suit is rendered timely. *See Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029 (5th Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977). As the Fifth Circuit explained, a cause of action "continues to accrue for as long as the defendant takes advantage of the contract in question," because "the defendant must continue to commit these acts in order to continue reaping the fruits of the allegedly unlawful contract or conspiracy." *Mangurian*, 549 F.2d at 1036–37. In *Harold Friedman, Inc. v. Thorofare Markets Inc.*, 587 F.2d 127 (3d Cir.1978), the Third Circuit considered the *Mangurian* rule in the context of a case where the question was "whether a plaintiff is precluded from suing for damages resulting from injuries that were caused by anticompetitive conduct if the conduct was authorized by a possibly unlawful contract that had been entered into before the limitations period had begun to run." *Harold Friedman, Inc.*, 587 F.2d at 139. The Third Circuit concluded that the "position of the Fifth Circuit is well-reasoned and we adopt it." *Id.* Thus, the payment of the commissions, the continued work on the PNPP contract, and the continued receipt of payments by defendants through February 1985, bring this action well within the six-year statute of limitations under New Jersey law.[7]

■ Defendants' arguments for barring this action based on laches or estoppel are also without merit. As to the former, aside from the fact that the suit was timely

brought, the Republic has a reasonable excuse for delay in light of the difficulty it would have faced in bringing suit during the Marcos regime. Moreover, in light of defendants' alleged scheme of bribery and subsequent cover up, they cannot enjoy the benefit of the doctrine of laches, which requires the party asserting it to be free from fault. *See Gallagher v. New England Mutual Life Insurance Co.*, 19 N.J. 14, 114 A.2d 857 (1955).

■ Likewise, defendants' claim of estoppel must fail. This claim appears to be that the Republic is estopped from asserting a cause of action against the defendants, because it "cleared" the defendants of any accusations of bribery. However, there is no showing that the Republic was acting with knowledge of the alleged bribery scheme; its contention, instead, is that the facts did not come to light until after President Marcos was removed from power. Similarly, as the Republic points out, given the allegations about the bribery scheme, defendants could not have reasonably relied on the so-called "clearance" because they knew that in fact bribery had taken place. Finally, as with laches, defendants cannot enjoy the protection of the doctrine of estoppel based on investigations thwarted by their own alleged cover up. *See Liberty Title & Trust Co. v. Plews*, 6 N.J. 28, 77 A.2d 219 (1950).

## III. THE EXISTENCE OF A CAUSE OF ACTION.

Defendants' next argument is that this Court should not recognize any cause of action under Philippine law for tortious interference with or for conspiracy to interfere with the fiduciary duty of a public official, namely, President Marcos. Defendants' interrelated arguments are (1) President Marcos, as the absolute dictator of the Philippines, possessed no fiduciary duty with which the defendants could interfere; (2) even if he did possess such a fiduciary duty, Philippine law does not recognize an

---

**7.** Because the Republic alleges a conspiracy involving both Westinghouse and Burns & Roe, Westinghouse's payment of commissions through February 1985 also binds Burns & Roe

for purposes of the statute of limitations. *See New York v. Hendrickson Bros.*, 840 F.2d 1065, 1084–85 (2d Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).

**1452**

independent civil cause of action which may be brought for the tortious interference (or conspiracy to interfere with) that duty; and (3) even if President Marcos owed the people of the Philippines a fiduciary duty, and even if there were a civil cause of action for interfering with that duty, both the political question doctrine and the act of state doctrine preclude this Court from entertaining plaintiff's claims. I consider each of these arguments in turn.

### A. Fiduciary Duty.

 Defendants contend that under then-existing Philippine law [8] President Marcos owed the people of the Philippines *no* fiduciary duty. Their argument for this proposition is a deceptively simple one. As the absolute dictator of the Philippines, defendants argue, every action President Marcos took was lawful, because his acts were the law. Or, put differently, defendants argue that President Marcos was legally bound to respect no authority other than his own. Therefore, they reason, if President Marcos did take any bribes, such conduct was entirely lawful, and was not in breach of any fiduciary duty President Marcos could owe to the people of the Philippines. Thus, they conclude that they may not be held liable for the tortious interference with a fiduciary duty which did not exist.

Defendants' argument, however, actually consists of two claims, one *de jure* and one *de facto*. First, defendants claim that, as a strictly legal matter, President Marcos owed the Philippines no fiduciary duty, because under the Philippine law as it existed at the time, neither the Philippine constitution nor any other law imposed any duty of any kind on President Marcos. This is manifestly not true.

As the Republic's legal experts have pointed out, under the Philippine legal system public officials, including the President, are "mere agents and not rulers of the people," and "every officer accepts office pursuant to the provisions of the law and holds the office as a trust for the people whom he represents." *Cornejo v. Gabriel & Provincial Board of Rizal,* 41 Phil. 188, 194 (1920). Indeed, Westinghouse's own expert concedes that this was the "standard" relation of public officials to the state. *See* Affidavit of Perfecto V. Fernandez, ¶ 3 (Mar. 15, 1991) ("Fernandez Aff."). This principle, of the public official as the mere agent of the state, was reiterated by the Philippine Supreme Court in a case decided *after* the imposition of martial law, which expressly noted that "[s]uch a fundamental postulate applies to the Executive itself. So it has been attested by a number of cases involving the President of the Philippines." *Radio Communications of the Philippines, Inc. v. Santiago,* 58 SCRA 493, 498 (1974).

Under Philippine law, however, this notion that public officers are agents and trustees of the state is not a mere abstract concept, but is embodied in a series of specific constitutional and legislative provisions. The Philippine Constitution in place at the time President Marcos declared martial law (the so-called 1935 Constitution) expressly provided that the "President shall ... take care that the laws be faithfully executed," 1935 Constitution, Art. VII, § 10(1), and the President (including President Marcos) was required to take an oath of office to that effect. *Id.,* Art. VII, § 7. When a new constitution was proclaimed in January 1973 (the so-called 1973 Constitution), President Marcos again took the same oath pursuant to the same constitutional provision. *See* Supplemental Affidavit of Eduardo G. Montenegro, ¶ 6 (July 18, 1989) ("Montenegro Aff.").[9]

---

**8.** Defendants contend that under New Jersey choice of law principles Philippine substantive law must apply to plaintiff's claims, and that the determinative law, for deciding whether President Marcos owed the Philippine people any fiduciary duty, was the law which existed during the period the alleged bribery scheme took place. The Republic appears to accept each of these contentions.

**9.** Although the provisions vesting the responsibility for the execution of the laws were modified somewhat during the period of martial law, the net result nonetheless was that during the entire period these provisions applied to President Marcos, charging him with the duty to insure that the laws of the Philippines be faithfully executed. *See* Montenegro Aff., ¶ 10.

Moreover, the 1973 Constitution expressly reaffirmed the "public trust" concept for government office holders, including the President, providing:

Public office is a public trust. Public officers and employees shall serve with the highest degree of responsibility, integrity, loyalty, and efficiency and shall remain accountable to the people.

1973 Constitution, Art. XIII, § 1.

The 1973 Constitution went on to impose specific obligations on the President. Two examples are of particular relevance to this case. First, the President was subject to impeachment for engaging in "culpable violation of the Constitution, treason, *bribery*, other high crimes, *or graft and corruption.*" 1973 Constitution, Art. XIII, § 2 (emphasis added). *See also id.*, § 4. Second, the 1973 Constitution provided:

The President shall not, during his tenure, hold any appointive office, practice any profession, participate directly or indirectly in the management of any business, *or be financially interested in any contract with or in any franchise or special privilege granted by, the Government or any subdivision, agency, or instrumentality thereof,* including any government-owned or controlled corporation.

1973 Constitution, Art. VII, § 4(2) (emphasis added). The 1973 Constitution remained in effect until President Marcos left the country in 1986. Although it was amended on three occasions, the foregoing provisions regarding the oath of office, the accountability of public officers, and the grounds for impeachment were not affected by any of these amendments. *See* Montenegro Aff., ¶ 11; *see also* Affidavit of Irene R. Cortes and Carmelo V. Sison, ¶¶ 37–40 (Jan. 19 and Mar. 6, 1991) ("Cortes/Sison Aff.").

In addition to these constitutional duties, essentially analogous statutory duties also existed for the President and other public officials. Thus, under Section 58 of the Revised Administrative Code of the Philippines (Act No. 2711, issued in 1917), the President is "responsible for the faithful execution of all laws operative within the Philippines." This provision remained in effect during the entire period of the Marcos regime, and indeed remains in effect today. *See* Montenegro Aff., ¶ 12.

Again, with particular significance for this case, the Philippine "Anti-Graft and Corrupt Practices Act," enacted in 1960, in relevant part prohibits any public officer from "[d]irectly or indirectly requesting or receiving any gift, present, share, percentage, or benefit, for himself or for any other person in connection with any contract or transaction between the Government and any other party, wherein the public officer in his official capacity has to intervene under the law." Republic Act (R.A.) No. 3019, § 3(b). Similarly, under § 3(h) of the same law, public officers are prohibited, "directly or indirectly," from "having financial or pecuniary interest in any business, contract or transaction in connection with which he intervenes or takes part in his official capacity...." *See also id.*, §§ 3(a), (c), (g), (i). The President falls within the Act's definition of a "public officer," and is therefore subject to its provisions. *See id.*, § 2(a), (b); *see also* Montenegro Aff., ¶ 13. R.A. No. 3019 was amended twice during the Marcos regime, but only to impose reporting requirements on public officials. Thus, rather than being repealed, the Anti-Graft and Corrupt Practices Act remained in effect and was strengthened during the Marcos regime. *See* Montenegro Aff., ¶ 14.

Title 7 of the Revised Penal Code of the Philippines ("RPC"), Act No. 3815, addresses crimes committed by public officers, who are defined to include any persons who "by direct provision of the law, popular election or appointment by competent authority, shall take part in the performance of public functions in the Government of the Philippine Islands." RPC, Art. 203. Obviously, this includes the President. *See* Montenegro Aff., ¶ 15. The RPC makes it a crime for a public officer to agree to perform an act (or to refrain from performing an act) in connection with his official duties, in exchange for any offer, promise, gift or present. Art. 210. Similarly, it is illegal under Art. 211 for a public officer to

accept gifts offered to him by reason of his office, and it is illegal under Art. 212 for any person to offer, promise or give gifts or presents to a public officer in violation of Arts. 210 or 211. These provisions of the RPC remained in effect during the entire Marcos regime and indeed remain in effect today. *See* Montenegro Aff., ¶ 16.

During the entire period of the Marcos government, including the period of martial law, President Marcos issued no decree, proclamation, order or other official document nullifying or limiting in any way the aforementioned constitutional and statutory provisions. *Id.*, ¶ 17. On the contrary, shortly after the imposition of martial law, President Marcos issued a decree which reinforced the existing prohibitions against bribery of public officials, including himself. *See* Presidential Decree No. 46; *see also* Montenegro Aff., ¶ 17. Indeed, President Marcos established a special court, known as the Sandiganbayan, which had jurisdiction over civil and criminal cases involving graft and corrupt practices, and during the Marcos regime there were numerous prosecutions in the Sandiganbayan for alleged violations of Anti–Graft and Corrupt Practices Act and the anti-graft provisions of the RPC. *See* Montenegro Aff., ¶¶ 19–20.

Of course, it is true, as defendants point out, that President Marcos instituted martial law, that he arrogated expansive powers to himself, that he ruled undemocratically for many years, and that he often violated the civil liberties and rights of his fellow citizens. Nor, presumably, would the Republic deny that the Marcos regime was corrupt—indeed, this forms the basis of the Republic's claim. None of this means, however, that the Philippine legal system was completely swept away during the Marcos regime, that—as a matter of law—President Marcos operated completely outside any legal norms, or that, as a result, everything President Marcos did was "absolutely lawful." *See* Westinghouse Br., at 93–94. On the contrary, de-

spite martial law, despite President Marcos' enormous power, and despite his repeated abuses of the rights and interests of the Philippine people, as a matter of then-existing Philippine law (which Westinghouse contends is the relevant standard) throughout his tenure President Marcos continued to operate within and subject to the rule of law.

Beginning with the institution of martial law itself, as the Republic's legal expert submits, "[m]artial law was not declared in a vacuum, outside the Constitutional framework." Affidavit of Emmanuel N. Pelaez, ¶ 9 (Apr. 23, 1991) ("Pelaez Aff."). Rather, the 1935 Constitution, under which the Philippines functioned at the time martial law was declared, expressly authorized the President to declare martial law under certain conditions. *See* 1935 Constitution, Art. VII, § 10(2).[10] In fact, in declaring martial law President Marcos expressly relied on this provision for authority, and set forth the reasons why he believed the conditions described in the 1935 Constitution for the declaration of martial law were met. *See* Proclamation No. 1081. Again, in the first of the orders implementing martial law, President Marcos relied on the 1935 Constitution as the legal basis for his actions. *See* General Order No. 1; *see also* Pelaez Aff., ¶ 9; Cortes/Sison Aff., ¶¶ 13–14, 16–17.

Given defendants' contention that martial law effectively obliterated the rule of law in the Philippines, one would expect any challenges to President Marcos' authority to occur—if at all—solely on an extra-legal basis. Such was not the case. When President Marcos suspended the writ of habeas corpus, *see* Proclamation No. 889, a legal challenge was brought, and the Philippine Supreme Court ruled that the proclamation's validity was a justiciable question. *See Lansang v. Garcia*, 42 SCRA 448, 473 (1971). The Court proceeded to consider whether there was a sufficient factual basis to support the writ's

**10.** Indeed, as the Republic's affiants point out, not only did the 1935 and 1973 Constitutions authorize the President to exercise emergency power in times of crisis, but the Philippine Constitution today continues to provide the President with emergency powers. *See* Cortes/Sison Aff., ¶ 6.

suspension, and upheld Marcos' decision. Similarly, a legal challenge was brought against the validity of Proclamation No. 1081, imposing martial law. This time, a plurality of the Court found that the validity of the proclamation was a political question, solely committed to the Executive. *See Aquino v. Ponce Enrile*, 59 SCRA 183 (1974); *see also* Pelaez Aff., ¶¶ 17–18.

Of course, defendants would emphasize that President Marcos prevailed in both of these challenges to his authority. But their position—that President Marcos' word alone was the law—cannot explain even why these legal challenges were brought before the Supreme Court, much less why the Court applied to the claims a legal analysis apparently derived from the Constitution. Indeed, all involved—the parties who brought suit, the Supreme Court, and President Marcos himself—appeared to operate on the assumption that it was still meaningful to think in terms of a body of law independent of the will of President Marcos.

Nor did the declaration of martial law lead to the repeal of existing laws. On the contrary, General Order No. 3 expressly confirmed that the government would continue to function "in accordance with existing laws." *See* Pelaez Aff., ¶ 10; *see also* Montenegro Aff., ¶ 5.

As noted, in January 1973 Marcos announced that a new constitution, the so-called 1973 Constitution, was ratified. This occurred within four months of the declaration of martial law. *See* Pelaez Aff., ¶ 21. The Westinghouse legal expert himself contends that with the passage of the 1973 Constitution, the government "took on a veil of constitutionalism," which "provided legitimacy for the dictatorship." Fernandez Aff., ¶¶ 15, 25.[11] This 1973 Constitution, of course, contained the very provisions, cited above, *see supra* at 1452–53, which placed specific fiduciary duties on the President. As already discussed, neither the 1973 Constitution, nor the President's fiduciary duties specified therein, were ever repealed during the remainder of the Marcos regime.

Westinghouse's legal expert attempts to suggest, however, that this constitutionalism of the Marcos government was meaningless, because President Marcos possessed the power *de jure* to "change the constitution." Fernandez Aff., ¶ 27. But Professor Fernandez's conclusory claims are undermined by his own description of events. He states that when President Marcos proposed certain amendments to the 1973 Constitution in 1976, he issued a call for a plebiscite to be held to consider the proposed constitutional changes. *Id.*, ¶ 26. As with the ratification of the origi-

---

**11.** The Westinghouse legal expert contends that President Marcos "engineered" the passage of the 1973 Constitution, but his own account fails to support this claim. *See also* Pelaez Aff., ¶ 21; Cortes/Sison Aff., ¶ 22. According to Professor Fernandez, the 1973 Constitution was drafted by a constitutional convention, through a process which began *before* the declaration of martial law. Under this process, the 1973 Constitution was to have been presented for ratification to a plebiscite of the Philippine people. Fernandez Aff., ¶ 16. President Marcos initially sought to present the 1973 Constitution to the plebescite for ratification. *Id.*, ¶ 18. However, a legal challenge was brought to halt this process, contending (1) that only Congress, not President Marcos, could call the plebescite for ratification, and (2) that in any case a plebescite was ill-advised, because the absence of protections for free speech and the shortage of time made it impossible to inform the people of the document's provisions. *Id.*, ¶ 19. Apparently recognizing that the court challenge might well be successful, President Marcos withdrew his

submission of the 1973 Constitution to the plebescite for ratification. *Id.*, ¶ 20. Instead, President Marcos submitted the 1973 Constitution for ratification to the so-called Citizens Assemblies, and in January 1973 he announced that the Constitution had been ratified, based on a majority of votes cast throughout the Philippines. *Id.*, ¶ 21.

In its reply brief, Westinghouse adds the contention that its own affiant simply fails to make, namely, that the Citizens Assemblies did not reflect "a true popular vote endorsing the 1973 Constitution." Westinghouse Reply Br., at 86 n. 39. What is interesting about this claim—aside from the lack of support from Westinghouse's own legal expert—is that it provides a useful example of the inconsistencies in Westinghouse's position. For while later in its argument Westinghouse claims that the act of state doctrine prevents this Court from passing on the legality of action taken by President Marcos, here Westinghouse urges this Court to pass on the validity of the entire constitutional system during the Marcos regime.

nal 1973 Constitution, a court challenge was brought, arguing that the referendum should be enjoined. The Philippine Supreme Court, however, rejected the challenge, finding that President Marcos had the power to propose constitutional amendments and to call a referendum "for ratification of his proposals by the people." *Sanidad v. Commission on Elections,* 73 SCRA 333, 374–75 (1976). Thereafter, in Professor Fernandez's own words, the "plebiscite was held and the amendments were approved...." Fernandez Aff., ¶ 27. *See also* Pelaez Aff., ¶ 23; Cortes/Sison Aff., ¶ 23. Thus, contrary to the assertion that President Marcos could single-handedly change the constitution, Professor Fernandez's own account shows only that President Marcos could *propose* constitutional amendments, the ultimate ratification of which—again, as a matter of Philippine law—remained in the hands of the Philippine people. Indeed, Professor Fernandez does not even contend that the plebiscite was fraudulent.

After martial law was declared and a new constitution was enacted, it is true that President Marcos came to exercise broad and sweeping powers, including powers which would ordinarily be exercised by a legislature. According to Professor Fernandez, President Marcos exercised sole legislative power from the declaration of martial law until 1981, and concurrent legislative power (with the Batasang Pambansa or National Legislature) thereafter until he was removed from power in 1986. Fernandez Aff., ¶ 24. The Philippine Supreme Court upheld this exercise of legislative power as authorized by the "commander-in-chief" clauses of the 1935 and 1973 Constitutions. *See Aquino v. COMELEC,* 62 SCRA 275 (1975). From this, defendants leap to the conclusion that, as a matter of Philippine law, whatever fiduciary duties President Marcos owed under either the

1973 Constitution or the Philippine statutes were obliterated by his exercise of legislative power. There are at least two obstacles to this argument.

First, while President Marcos possessed the power to amend Philippine statutory law, he did not (as discussed above) possess the power to amend the 1973 Constitution, and consequently his legislative powers remained subject to constitutional limitations. *See* Cortes/Sison Aff., ¶ 18. In response, Westinghouse's legal expert, Professor Fernandez, points to General Orders No. 3 and 3–A, issued shortly after the declaration of martial law, which removed from the jurisdiction of the courts any case

> involving the validity, legality or constitutionality of Proclamation No. 1081, dated September 21, 1972, or of any decree, order or acts issued, promulgated or performed by me or by my duly designated representative pursuant thereto.

*See* Fernandez Aff., ¶ 8. Thus, Westinghouse contends, the constitutional limitations on Marcos' legislative power were legally meaningless because he had eliminated judicial review.[12] The problem with this argument is that it rather plainly appears that this restriction on the courts' jurisdiction did not continue after the passage of the 1973 Constitution[13]—as is evident from the numerous cases where courts actually considered challenges to President Marcos' exercise of power throughout the period of his regime. Indeed, shortly after the ratification of the 1973 Constitution, a case was brought challenging the ratification process, yet the Court did *not* throw out the case on the ground that General Order Nos. 3 and 3–A divested it of jurisdiction. *See Javellana v. Executive Secretary,* 50 SCRA 30 (1973); *see also* Cortes/Sison Aff., ¶ 22; Pelaez Aff., ¶¶ 15, 17. In fact, in *Aquino v. Ponce Enrile,* 59 SCRA 183 (1974), a direct chal-

---

**12.** Of course, it is not true generally that constitutional limitations are meaningful only when enforced by judicial review, which is, after all, a somewhat unusual institution as governments go. Similarly, the absence of judicial review of the actions of executive or legislative power does not necessarily mean that a government operates outside the rule of law.

**13.** The 1973 Constitution, like the 1935 Constitution before it, expressly granted the Supreme Court the power to review the constitutionality of any law, executive order or regulation. *See* 1973 Constitution, Art. X, § 5(2–a).

lenge to Proclamation No. 1081, declaring martial law, not only did the Court fail to apply General Order Nos. 3 and 3–A as a basis for denying jurisdiction, but two justices held that these orders, insofar as they limited the jurisdiction of the civilian courts, must be deemed revoked, and they further intimated that they were unconstitutional. *See Aquino v. Ponce Enrile*, 59 SCRA at 277 (Opinion of Castro, J.); *id.* at 376 (Opinion of Barredo, J.). These intimations were confirmed in the later decision *Lina v. Purisima*, 82 SCRA 344 (1978). In *Lina*, the petitioner was a civil servant who brought suit challenging his discharge, which was "pursuant to a Letter of Instruction issued by the President pursuant to Proclamation No. 1081," i.e., pursuant to the declaration of martial law. *Lina*, 82 SCRA at 350. The lower court dismissed the petition, on the basis that General Order No. 3 divested the court of any jurisdiction to consider the validity of any action taken pursuant to the declaration of martial law. On appeal, however, the Supreme Court rejected this contention, holding that the lower court's invocation of General Order No. 3 was "nothing short of an unwarranted abdication of judicial authority, which no judge duly imbued with the implications of the paramount principle of independence of the judiciary should ever think of doing." *Id.* at 351. The Court noted that it had *"always* deemed General Order No. 3 including its amendment by General

Order No. 3–a as practically inoperative." *Id.* (emphasis added). The Court explained:

> While the members of the Court are not agreed on whether or not particular instances of attack against the validity of certain Presidential Decrees raise political questions which the judiciary would not interfere with, there is unanimity among Us in the view that it is for the Court rather than the Executive to determine whether or not We may take cognizance of any given case involving the validity of acts of the Executive Department purportedly under the authority of the martial law proclamations.

*Id.* Thus, the Court concluded, the lower court's invocation of General Order Nos. 3 and 3–A was a "constitutionally-uncalled-for submissiveness to the Executive." *Id.* at 352. Thus, *Lina* not only confirmed that actions by President Marcos remained subject to judicial review, but in fact held that General Order No. 3 and 3–A were constitutionally invalid. *See also* Cortes/Sison Aff., ¶¶ 20, 30; Pelaez Aff., ¶ 16; *and see Cadwallader v. Abeleda*, 98 SCRA 123, 159–60 (1980) (finding that President Marcos' power to review contracts under the 1973 Constitution's transitory provisions did not authorize him to validate legally defective government contracts).[14]

But more basically, even if President Marcos' legislative acts were not subject to judicial review, it would not follow that he

---

**14.** Westinghouse's legal expert raises two other points with respect to the independence of the judiciary, but neither demonstrates that President Marcos' power was not subject to judicial review. First, Professor Fernandez points out that President Marcos created military tribunals to consider certain offenses, and that because President Marcos had the power to review their decisions, he exercised a measure of judicial authority. Fernandez Aff., ¶ 9–11. However, as pointed out by the Republic's expert, the civilian courts remained open and functioning during this entire period, and they were not supplanted by the limited jurisdiction of the military courts. *See* Cortes/Sison Aff., ¶ 32.

Second, Professor Fernandez claims that President Marcos could replace any sitting judge at will—yet, he cites no constitutional, statutory or other legal authority for this claim. Apparently, Professor Fernandez is referring to transitory provisions in the 1973 Constitution, which authorized President Marcos to replace incumbent

judges from the prior constitutional system. However, by retaking the oath of office under the new constitution, the justices of the Supreme Court regained their security of tenure. *See Aquino v. Ponce Enrile*, 59 SCRA 183, 373–74 (1974) (Opinion of Barredo, J.). Likewise, Professor Fernandez asserts that lower level judges were ousted from office under a reorganization of the judiciary which took place in 1981. *See* Fernandez Aff., ¶ 11. Professor Fernandez fails to observe, however, that the reorganization of the judiciary was effectuated by an enactment of the National Legislature, and not by a Marcos decree. *See* Cortes/Sison Aff., ¶ 34. Indeed, even under Article III of the United States Constitution, which only expressly provides for the existence of a Supreme Court, presumably the very existence of the lower federal courts, and certainly the contours of their jurisdiction, are subject to the control of Congress.

owed no legal fiduciary duties to the Philippine people. As previously noted, *see supra* at 1452–54, President Marcos' fiduciary duties were spelled out in some detail, both in constitutional and statutory provisions. Although President Marcos may have been empowered to repeal his fiduciary duties which were provided by statute, the simple fact is that he never did so; thus, he remained subject to both his constitutional and statutory fiduciary duties. Nonetheless, Westinghouse's legal expert claims:

> Any actions of President Marcos apparently contrary to existing law, including the criminal statutes concerning bribery of public officials ..., were not a violation of those laws; Marcos's actions were themselves law, and in effect, stood as exceptions to the statutes.

Fernandez Aff., ¶ 30. Professor Fernandez never actually cites any legal authority to support this claim, but in another portion of his affidavit, he cites a provision of the 1973 Constitution, as follows:

> All proclamations, orders, decrees, instructions, and *acts* promulgated, issued or *done* by the incumbent President shall be part of the law of the land, and shall remain valid, legal, binding, and effective even after the lifting of martial law or the ratification of this Constitution.

1973 Constitution, Art. XVII, § 3(2) (emphasis added). By italicizing the words "acts" and "done," Professor Fernandez apparently would suggest that this constitutional provision turned every physical act by President Marcos into a law unto itself. *See* Fernandez Aff., ¶ 17.[15]

This reference to this provision in the 1973 Constitution is misleading, for at least two reasons. First, Article XVII, § 3(2) was simply a transitory provision, designed to insure the continued validity of actions taken during the period of martial law, before the passage of the 1973 Constitution. *See* Pelaez Aff., ¶ 22. More importantly, however, the "acts" referred to in the passage quoted above, are not mere physical acts, but rather legislative acts or

official acts of office. Thus, in *Luneta v. Special Military Commission No. 1*, 102 SCRA 56, 65–66 (1981), the Supreme Court held that, at most, Article XVII, § 3(2) could encompass "official and formal pronouncements of the President on public occasions of importance," and more likely would require formal promulgation, and not mere oral statements. *See also Tanada v. Tuvera*, 136 SCRA 27 (1985) (holding that to be constitutionally valid and binding, Marcos legislative issuances must comply with certain minimum publication requirements deducible from traditional constitutional principles); *cf. Aquino v. Enrile, supra,* 59 SCRA at 376. Defendants have pointed to no other possible source of Philippine law which would provide that by the mere physical act of taking bribes President Marcos could create a legal exception to the statutory prohibitions on bribery.

In sum, every possible source of Philippine law—constitutional and statutory provisions, judicial decisions, and proclamations by President Marcos himself—confirms that, as a matter of then-existing Philippine law, President Marcos remained subject to the rule of law generally, and thus remained subject to the various, specific fiduciary duties imposed upon him by the 1973 Constitution and the statutes thereunder.

Defendants, however, add a second string to their bow, contending that regardless of whether President Marcos remained legally subject to the constitutional and statutory duties imposed upon him, as a practical matter he was subject to no law other than his own free will. In other words, defendants contend that even if President Marcos owed the Republic certain fiduciary duties *de jure,* he owed nothing *de facto.* There are, however, at least two fatal defects with this argument.

First, defendants' description of the Philippine legal and political "realities" is, at best, a gross oversimplification. As scholars have pointed out in other contexts, even where a political regime possesses vast powers, both *de jure* and *de facto,* even

---

**15.** The fact that Professor Fernandez never actually relies on this constitutional provision to support his argument suggests that it is something which even he finds doubtful.

where it rules undemocratically, and even where it repeatedly abuses the rights of its citizens, it may nonetheless remain subject, both legally and practically speaking, to the rule of law. This may occur for a variety of complex and subtle reasons, including but not limited to, the continuing influence of the nation's legal tradition, the pressure of both domestic and international opinion, and even the sincere desire of the regime to remain subject to legal norms. *See, e.g.,* Ellmann, *Legal Text & Lawyers' Culture in South Africa,* 17 N.Y.U.Rev.L. & Soc. Change 387, 389–94 (1989–90). As the Republic's affiants have pointed out, President Marcos regularly averted to legal norms to support his actions, and persistently maintained that he remained subject to the rule of law and the Constitution. *See, e.g.,* Pelaez Aff., ¶¶ 12, 14; Cortes/Sison Aff., ¶ 36. This adherence to legal norms was further revealed by President Marcos' willingness to allow the Supreme Court to hear and decide constitutional challenges to his authority. Pelaez Aff., ¶ 15. This was not mere show, for on occasion it produced real constraints on President Marcos' conduct of affairs. Thus, as Professor Fernandez himself recounts, in the face of a constitutional challenge, *see Planas v. Commission on Elections,* 49 SCRA 105, 111 (1973), President Marcos was forced to withdraw a decree relating to the ratification of the 1973 Constitution. *See* Fernandez Aff., ¶¶ 19–20. Similarly, Professor Fernandez explains that President Marcos sought to avoid convening the National Assembly, because under a prior Supreme Court ruling it would have resulted in a return of legislative powers to the legislature. *Id.,* ¶¶ 25–26. And, as one of the Republic's affiants recounts, under legal challenge President Marcos was repeatedly forced to release prisoners or remove restrictions on civil liberties. *See* Pelaez Aff., ¶ 20.

But more fundamentally, the defendants' contentions about President Marcos' *de facto* power run far afield from their original argument, which is that President Marcos owed the people of the Philippines no fidu-

ciary duties *under then-existing law.* This is reflected in the inconsistencies in Westinghouse's argument. Thus, Westinghouse dismisses the pronouncements of the Philippine Supreme Court as not reflecting the "historical realities," and it urges this Court not to be fooled by a constitutional system they say existed "in name only." *See* Westinghouse Reply Br. at 89, 90. Yet, literally sandwiched in between these arguments, Westinghouse castigates the Republic for describing the "practical constraints" on the Marcos regime which, Westinghouse asserts, "belong to the realm of political theory, not law." *Id.* at 90. Obviously, defendants cannot have it both ways. If the question is whether the law placed certain obligations on the Marcos regime (as it plainly did), then those obligations do not simply disappear the minute they are violated. Of course, defendants would argue that third parties who participated in (and profited from) "business as usual" during the Marcos regime, owe nothing to the Philippine people, for their conduct was sanctioned by the then-existing "historical realities." But their position is actually a good deal more cynical than this. For if President Marcos, in the very act of violating his nation's laws, placed himself above the law and rendered his conduct "absolutely lawful," then the Philippine people could never expect a legal accounting from Marcos for his conduct while in office. Whatever may recommend this view, it "belong[s] to the realm of political theory, not law," and I reject it accordingly.

### B. Cause of Action.

Defendants' next argument is that even if one agrees that President Marcos owed a fiduciary duty to the Philippine people which he violated by accepting bribes, this does not give rise to a civil cause of action for damages. Because I conclude that a civil cause of action under Philippine law unquestionably would arise in connection with the alleged violation of the Philippine criminal statutes, I reject defendants' argument.[16]

---

16. The Republic also contends that, apart from

its criminal statutes, civil liability for the alleged

While defendants paint their argument as challenging the very existence of any applicable civil cause of action, upon examination, their claim is really much more modest. Thus, it cannot be disputed—and defendants do not dispute—that: (1) the alleged bribery scheme alleged would be in violation of the Anti–Graft and Corrupt Practices Act, R.A. No. 3019 and in violation of Articles 210 and 212 of the Revised Penal Code ("RPC"), *see* Affidavit of J. Cezar S. Sangco, ¶¶ 5–6 (Aug. 9, 1989) ("Sangco Aff."), both in existence during the entire time of the Marcos regime; (2) under the Philippine Civil Code, Article 1161, and the RPC, Article 100, civil liability may arise for criminal offenses generally, including the criminal offenses applicable here, *see* Sangco Aff., ¶ 4; and (3) pursuant to Civil Code, Article 30, ancillary proceeding for civil liability arising out of the criminal offense may be brought separately, where no criminal proceeding is brought, *see* Supplemental Affidavit of Manuel C. Herrera, ¶¶ 4, 6 (Apr. 25, 1991) ("Herrera Supp.Aff."); *see also* R.Crim. Pro. 111. All of these provisions were in force during the entire Marcos regime, from the time the bribery scheme allegedly began to the moment suit was brought in this Court. Thus, it would appear to be beyond dispute that the Republic may bring an independent civil action for damages arising out of the violation of the aforementioned criminal statutes. *See* Fernandez Aff., ¶¶ 40, 46; *see also* Sangco Aff., ¶ 7 (setting out elements of cause of action).

Nonetheless, the defendants contend that a change in the law during the Marcos regime prevents the Republic from bringing suit. The change they have in mind did not occur until December 10, 1978, some four years into the alleged bribery scheme, and it did not in any way repeal the basis for civil liability described above. Instead,

by Presidential Decree No. 1606, President Marcos created a special court, called the Sandiganbayan, designed to handle criminal cases arising out of violations of R.A. No. 3019 and Title VII of the RPC (which includes Articles 210 and 212), as well as other crimes involving public officers or employees. Originally, the Sandiganbayan had exclusive jurisdiction over some criminal cases, and concurrent jurisdiction (with the regular courts) over others, depending on the level of punishment. *See* Presidential Decree No. 1606, § 4(c). Subsequently, on March 23, 1983, Presidential Decree No. 1861 amended the jurisdiction provisions for the Sandiganbayan, by providing that in every case under R.A. No. 3019 and Title VII of the RPC, regardless of the level of punishment, the Sandiganbayan's jurisdiction over the specified criminal offenses would be exclusive. *See* Presidential Decree No. 1861, § 4(a)(1). Defendants contend that the nature of the Republic's claims, and the appropriate level of punishment under the Philippine criminal statutes, would mean that even prior to the 1983 amendment the Sandiganbayan's jurisdiction over the criminal offenses alleged here would be exclusive. I will assume *arguendo* that this is correct.

Defendants then rely on the following provision in the Presidential Decrees creating the Sandiganbayan, which they contend requires every civil action for damages arising out of a violation of the applicable criminal statutes also to be filed in the Sandiganbayan.

Any provision of law or the Rules of Court to the contrary notwithstanding, the criminal action and the corresponding civil action for the recovery of civil liability arising from the offense charged shall at all times be simultaneously instituted with, and jointly determined in the same proceeding by the Sandiganbayan or the appropriate courts,[17] the filing of the

bribery would also arise separately under the Philippine Civil Code. While this claim is very likely meritorious, in view of my conclusion that civil liability exists in connection with the criminal statutes, I need not sort out the parties' numerous arguments and counter-arguments

with respect to liability arising wholly under the Civil Code.

**17.** This reference to other "appropriate courts" is not relevant to the Republic's claims, for it refers to a jurisdictional provision which relates to other types of criminal offenses involving

criminal action being deemed to necessarily carry with it the filing of the civil action, and no right to reserve the filing of such civil action separately from the criminal action shall be recognized: PROVIDED, HOWEVER, that where the civil action had heretofore been filed separately but judgment therein has not yet been rendered, and the criminal case is hereafter filed with the Sandiganbayan or the appropriate court, said civil action shall be transferred to the Sandiganbayan or the appropriate court, as the case may be, for consolidation and joint determination with the criminal action, otherwise the separate civil action shall be considered abandoned.

Presidential Decree No. 1861.[18] Because of this provision, defendants argue, although the Republic admittedly would have a cause of action under Philippine law, it could only be filed concurrently with criminal proceedings in the Sandiganbayan.

There are at least three defects with this argument, any one of which is fatal. The first problem is that it is not clear that the Presidential Decree upon which defendants rely actually supports their position. It certainly does appear that if a criminal action is filed, and comes within the exclusive jurisdiction of the Sandiganbayan, then any ancillary civil proceeding would also have to be brought in that court. Likewise, under the March 1983 decree, for criminal offenses within the exclusive jurisdiction of the Sandiganbayan, if a civil suit for liability arising out of a relevant criminal offense is filed in a regular court, *and*

the related criminal case is subsequently filed in the Sandiganbayan, then the civil case must either be transferred to the Sandiganbayan or abandoned.[19] However, it is by no means clear what occurs, if anything, when a civil case for damages arising out of a criminal offense is filed in a regular court, and no criminal case is ever filed. It will be recalled that under Article 30 of the Civil Code, it is expressly provided that a civil action arising out of a criminal offense may be filed, even when no criminal action is ever brought. Nothing in the Presidential Decree creating the Sandiganbayan, or the March 1983 amendment, changes this provision. Rather, the requirement that the civil action be filed or consolidated with the criminal action in the Sandiganbayan consistently turns on the condition that a criminal proceeding is brought. In the absence of that event, nothing appears to require that the civil action be filed in the Sandiganbayan. Indeed, prior to the March 1983 amendment, the relevant provisions appeared specifically to eschew requiring the filing of the civil action in the Sandiganbayan. Thus, it was provided that if the civil action were first filed in the regular courts, *either* the criminal action could be brought in the Sandiganbayan and the civil case consolidated therewith, *or* the criminal case could also be brought in the regular courts, *or* (apparently) the criminal case could simply be dismissed (by virtue of the permissive language that the criminal action "may" be filed in the regular courts). Even after the March 1983 amendment, the requirement of consolidating the civil action in the Sandiganbayan

public officials. *See* Presidential Decree No. 1861, § 4(a)(2).

**18.** Defendants rely solely on the portion of this passage before the proviso, which was not amended in any relevant way by the March 1983 Presidential Decree. However, the language after the proviso was altered in two respects. First, prior to 1983, when there still was a category of cases for which the Sandiganbayan and the regular courts shared concurrent jurisdiction, this portion of the Decree also provided that if "the criminal or civil action is first filed with the regular courts, the corresponding civil or criminal action, as the case may be, shall only be filed with the regular courts of competent jurisdiction." *See* Presidential De-

cree No. 1606. Second, prior to 1983, for cases within the exclusive jurisdiction of the Sandiganbayan, if the civil action was first filed in the regular courts, *and* the corresponding criminal action was later filed in the Sandiganbayan, *either* the civil action would have to be consolidated with the criminal action in the Sandiganbayan, *or* the criminal action could no longer be filed in the Sandiganbayan.

**19.** However, as noted, under the version of the Sandiganbayan's provisions in effect prior to March 1983, this was *not* the case. Rather, the result of the later filed criminal case was only that the two cases had to be filed somewhere— either in the Sandiganbayan or in the regular courts.

appears to be triggered only when a criminal case is subsequently filed.

As Justice Herrera points out, this construction would make eminent sense. From the terms of the decrees, the requirement of consolidation "was purely procedural, intended to ensure judicial economy and optimum use of the Government's prosecutorial resources." Herrera Supp. Aff., ¶ 10. Thus, where, as in this case, a party with potential civil liability is beyond the territorial and physical jurisdiction of the Sandiganbayan, there is no reason why this should preclude a civil suit in a foreign court, id., ¶ 11—a lawsuit, it will be recalled, which will still be pursuant to a cause of action which defendants concede exists under Philippine law. Defendants supply nothing beyond their own *ipse dixit* to support a reading of the decree which would preclude filing a civil action in the absence of a criminal case.

 But even if the defendants' reading of the Presidential Decrees governing the Sandiganbayan were more plausible, their conclusion that we are precluded from hearing the case in this Court does not follow. In *Randall v. Arabian American Oil Co.*, 778 F.2d 1146 (5th Cir.1985), the Fifth Circuit faced an almost identical problem. A lawsuit was brought claiming wrongful discharge in Saudi Arabia. The Fifth Circuit found that Saudi Arabian labor law applied, and recognized that plaintiff's claim was one which fell within the "exclusive jurisdiction" of a Saudi tribunal. Nonetheless, the Fifth Circuit concluded that the "exclusive jurisdiction" provision was merely procedural in nature, and therefore did not bar bringing suit in federal court in the United States. It "stands to reason that if the Full Faith and Credit Clause of the United States Constitution, which is the Supreme Law of the land, does not compel one state from recognizing the exclusive jurisdiction provisions of a sister state, then we see little or no reason why in a transnational case such as this, where no higher positive law binds us, we should be compelled to give effect to a foreign state's exclusive jurisdiction provision." *Id.* at

1153. *Accord Veitz v. Unisys Corp.*, 676 F.Supp. 99, 102 (E.D.Va.1987); *Curtis v. Harry Winston, Inc.*, 653 F.Supp. 1504, 1507–09 (S.D.N.Y.1987).

Defendants try valiantly to distinguish *Randall*, but to no avail. First, they argue that the Sandiganbayan provision at issue here is different because, aside from placing jurisdiction in the Sandiganbayan, it "expressly extinguished" any right to bring a civil action except as ancillary to a criminal proceeding, and thereby raised the standard of proof. *See* Westinghouse Reply Br. at 97. However, the provision "expressly extinguishing" any right to bring a separate civil action exists nowhere except in the defendants' imagination, and the Sandiganbayan decrees do not even mention standards of proof.[20] Second, defendants argue that under New Jersey choice of law rules a foreign plaintiff may not "file suit in New Jersey courts to evade 'procedural' bars in their home states—this is the *Heavner* rule." Westinghouse Reply Br. at 97. The bare reference to an inapposite case (which was limited to the issue of the statute of limitations), without so much as a pinpoint cite, let alone a reasoned analysis, cannot support defendants' argument. For still more makeweight, defendants assert that they "demonstrated" in their prior brief that "under conflict of laws rules" this Court may not enforce the Philippines' criminal statutes. *See id.* Assuming that defendants' bare reference to a case which is over 165 years old demonstrated much of anything, *see* Westinghouse Br. at 97 n. 39, their claim is simply irrelevant because no one is seeking to enforce a criminal statute in this case. Finally, defendants contend that the Fifth Circuit decision in *Randall* rested on the interest in providing a forum for the plaintiff, a United States citizen. It is true that the court in *Randall* included this as a factor in its analysis, but it was hardly the only factor. Moreover, the Fifth Circuit also placed weight on the fact that the defendant allegedly prevented the plaintiff from using the Saudi forum, *see Randall*, 778 F.2d at 1153, an argument with rele-

---

**20.** The issue of standards of proof is discussed more fully below.

vance here, where the Republic contends that by placing themselves and their assets beyond Philippine territorial jurisdiction, defendants effectively prevented the Republic from using the Sandiganbayan. Finally, the Fifth Circuit also recognized the foreign nation's interests, *see id.*, but here those interests favor this lawsuit, for the Republic manifestly wants an opportunity to pursue defendants for their wrongdoing in this Court. Indeed, it is not easy to see what interest (other than defendants' interest in evading suit) favors strict adherence to the so-called exclusive jurisdiction provisions of the Sandiganbayan.

But even if the Sandiganbayan provisions were read as defendants suggest, and even if I were compelled to give them effect in this Court, the provisions were effectively nullified on May 7, 1986, when President Aquino issued Executive Order No. 14. The effect of Section 3 of Executive Order No. 14 was to return the procedural law to the place it stood prior to the creation of the Sandiganbayan, so that (as under the Civil Code, Article 30) it was again expressly provided that civil actions could be brought separately and independently of any criminal proceedings—thus removing any conceivable obstacle created by the Sandiganbayan decrees. *See* Herrera Aff., ¶ 12. Defendants' efforts to evade Executive Order No. 14 cannot succeed. First, they argue that they are not encompassed by the provisions of the Order, but even Westinghouse's own legal expert admits that he has no authority to support this claim. *See* Fernandez Aff., ¶ 51. Moreover, as one of the Republic's affiants observes, even if defendants do not fall within the terms of Executive Order No. 14 individually, they would in any case be within its scope as co-conspirators of persons subject to the order. *See* Herrera Supp.Aff., ¶ 19. Defendants virtually concede this point. *See* Westinghouse Reply Br. at 102 n. 47.

Defendants also argue that Executive Order No. 14 cannot be applied retroac-

tively, either because it will violate the ex post facto clause of the Philippine Constitution, or the Philippine or United States due process or equal protection clauses. This argument is literally riddled with holes. First, it is difficult to even make sense of defendants' complaint that the Executive Order is being applied "retroactively." Both at the time the alleged bribery scheme began, and at the time this lawsuit was finally brought, it was possible under Philippine law to bring a civil cause of action for damages arising out of a criminal offense, separate from any criminal proceeding. Why any intervening set of procedural rules should even matter is hard to grasp.

Second, the contention that Executive Order No. 14 violates the Philippine constitution is so obviously without merit that by the time of its reply brief Westinghouse refers to this as an "open question."[21] Westinghouse's own expert admits that there is no Philippine court which has found that the relevant provision of Executive Order No. 14 is invalid, and indeed concedes that the decision of the Supreme Court in *Republic v. Sandiganbayan*, 173 SCRA 72, 81–83 (1989) "appears to assume the validity of Section 3." *See* Fernandez Aff., ¶ 53. Professor Fernandez suggests that the decision in *Cojuangco v. PCGG*, G.R. No. 92319-90 (Oct. 2, 1990) "strongly suggests that Section 3 would be struck down as invalid." Fernandez Aff., ¶ 53; *see also id.*, ¶¶ 54–55. But as Justice Herrera demonstrates, the reliance on the portion of an opinion of one justice (not joined by the other members of the court), about a completely different issue than is presented here (to wit, the scope of the investigative authority of the Philippine Commission on Good Government), is completely misplaced. *See* Herrera Supp.Aff., ¶¶ 15–18. Indeed, similar challenges were made to the provisions governing the Sandiganbayan—as being an ex post facto law and as violative of equal protection and due

---

21. As I have already noted in another context, *see supra* note 11, the curious aspect of Westinghouse's position is that while they apparently believe I should strike down a Philippine execu-

tive order as violative of the Philippine Constitution, at a later point in the same brief they argue that the act of state doctrine prevents this Court from hearing this case.

process—but they repeatedly failed. *See* Herrera Supp.Aff., ¶ 13.

Finally, while defendants have done little to flesh out, much less support, their contention that the application of Executive Order No. 14 would somehow violate the United States Constitution, we can be easily satisfied that their claim lacks merit, because it is premised on a clearly defective premise. Defendants argue that the retroactive application of Executive Order No. 14 would be unconstitutional because it would lower the burden of proof from beyond a reasonable doubt standard to a mere preponderance. Defendants' apparent belief is that with the Sandiganbayan, proof of all criminal claims was according to a reasonable doubt standard, and that the ancillary civil claims followed the same standard of proof. But defendants provide no support for this claim, and it is simply not true. As Justice Herrera points out, under the Civil Code, where a civil action is brought for damages arising out of a criminal offense, the standard of proof for the civil claim is *always* a preponderance of the evidence, whether the civil and criminal claims are brought together or separately, and whether or not the criminal action is brought at all. *See* Herrera Supp.Aff., ¶ 6. *See* Civil Code, Art. 30; *see also* Civil Code, Arts. 31, 32(2), 33, 34, 35. In fact, as explicitly stated in Civil Code, Art. 29, if a criminal action is brought and the accused "is acquitted on the ground that his guilt has not been proved beyond reasonable doubt, a civil action for damages for the same act or omission may be instituted. *Such action requires only a preponder-*

ance *of evidence."* *See also* Herrera Supp. Aff., ¶ 7. Defendants have pointed to no provision in the decrees related to the Sandiganbayan (or any other legal authority, for that matter) which supports their contention that with the Sandiganbayan the burden of proof was changed in any way. In fact, Justice Herrera, who was a prosecutor who brought cases before the Sandiganbayan, attests that the Sandiganbayan "did not at all affect the standard of proof applicable to civil actions arising from crime, which was and remained a preponderance of the evidence." Herrera Supp. Aff., ¶ 9; *see also id.,* ¶ 10. Thus, defendants' claim that Executive Order No. 14 lowered the burden of proof to a preponderance of the evidence, and thereby cannot lawfully be applied in this case, is utterly specious.

In short, defendants have come forward with nothing to show that the Republic cannot state a cognizable cause of action under Philippine law.[22]

### C. *Political Question and Act of State Doctrines.*

Defendants finally contend that both the political question and act of state doctrines prevent this Court from hearing the Republic's claims. These arguments are no more meritorious today than when I rejected them two years ago.

First, defendants argue that the political question doctrine should require dismissal here because I lack "judicially discoverable and manageable standards" for deciding the issues presented. *See* Westinghouse Br. at 103 (quoting *Baker v.*

---

**22.** Defendants also appear to suggest on occasion that the Republic would not be authorized to bring a civil action for damages arising out of criminal offenses. Aside from the fact that defendants provide no support for this claim, and that it appears that the government has already brought actions seeking civil liability, *see, e.g., Padilla v. Court of Appeals,* 129 SCRA 558 (1984), *see also* Herrera Supp.Aff., ¶ 7, the short answer is that the Republic is, under Philippine law, a juridical person with the capacity to sue and be sued. *See* Affidavit of Haydee B. Yorac, ¶ 15 (Apr. 25, 1991).

Finally, Westinghouse's legal expert contends that there is no separate cause of action for conspiracy in this case, because under RPC Arti-

cle 8, conspiracy exists as a separate crime only where the criminal statute in question specifically so provides. *See* Fernandez Aff., ¶ 58. However, Article 8 *does* recognize the existence of conspiracies, and Philippine law treats co-conspirators as vicariously liable for one another's acts, thus subjecting all conspirators to the same liability, both civil and criminal, for the underlying offense. *See* Sangco Aff., ¶¶ 9–11; *see also* Affidavit of Ruben F. Balane, ¶ 12 (Apr. 25, 1991). Consequently, even if Professor Fernandez is correct, it only follows that Counts 3 and 8 should be pled together, which would appear to have no practical significance for this case.

*Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962)). As the Republic points out, applying the doctrine in this case would do nothing "to keep the judiciary in equilibrium relative to other branches of government" or "prevent unnecessary conflict" with Congress and the Executive. *Alexander v. Todman*, 337 F.2d 962, 968 (3d Cir.1964), *cert. denied*, 380 U.S. 915, 85 S.Ct. 893, 13 L.Ed.2d 800 (1965). Defendants' argument, rather, is that deciding this case will necessarily involve this Court in "metaphysical" issues of whether President Marcos owed the Philippines a fiduciary duty under Philippine law. Westinghouse Br. at 104.[23]

This case involves no such "metaphysical" issues. Rather, the question is whether the Republic has a cause of action here and, if so, what the elements of that claim might be. As explained at great length above, under specific provisions of Philippine statutory law, a civil cause of action for damages arises for certain criminal offenses. The Republic has identified a number of specific criminal statutes which would thus give rise to civil liability. These criminal statutes were on the books during the relevant period, are plainly applicable to the Republic's claims, and—rather than involving some vague or abstract concept of "duty"—consist of rather detailed and specific prohibitions on bribery, graft and other forms of corruption. Thus, this case involves what is common to every diversity suit, namely, interpreting and applying the law of another jurisdiction. As the Ninth Circuit observed in a very similar context, "questions of foreign law are not beyond the capacity of our courts.... The court will be examining the acts of the president of a country whose immediate political heritage is from our own.... Our courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law." *Republic of the Philippines v.*

*Marcos*, 862 F.2d 1355, 1361 (9th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). *See also Republic of the Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir.1986), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).

It is true that defendants have argued that I should ignore the plain prohibitions of Philippine law because they believe President Marcos' *de facto* power negated the very existence of these laws. But as I have already explained, I reject defendants' arguments precisely because they depart from the law and enter the realm of political theory. Obviously, the fact that defendants merely raise an argument which has no place in a court of law does not mean that the Republic's claims must be dismissed with defendants' argument.

■ Defendants' reargument for application of the act of state doctrine fares no better. Defendants rely on the recent Supreme Court decision in *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990), but the Supreme Court refused to apply the act of state doctrine in *Tectonics* on facts strikingly similar to this case. The Supreme Court articulated the act of state doctrine as requiring "that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." 110 S.Ct. at 707. In *Tectonics* the defendant corporation allegedly paid a "commission" to a Nigerian citizen with the understanding that the money would be used as a bribe for Nigerian officials in order to obtain a contract. *Id.* at 703. The Court acknowledged that proving the facts necessary for plaintiff's RICO and other claims "will also establish that the contract was unlawful," but nonetheless rejected application of the act of state doctrine:

> Regardless of what the court's factual findings may suggest as to the legality

**23.** Defendants are not entirely clear whether they are raising their argument under American or Philippine law, but it is equally meritless under both. While it is true that the Philippines, like the United States, has a political question doctrine and, for example, applied the political question doctrine to a challenge to President Marcos' proclamation of martial law, *see Aquino v. Enrile*, 59 SCRA 183 (1974), it does not follow that it would apply in this case. *See, e.g., Demetria v. Alba*, 148 SCRA 208 (1987); *see also* Cortes/Sison Aff., ¶¶ 42–43.

of the Nigerian contract, its legality is simply not a question to be decided in the present suit, and there is thus no occasion to apply the rule of decision that the act of state doctrine requires.

*Id.* at 705.

Likewise, in this case, for purposes of Counts 3 and 8 of the Republic's complaint, the legality of the PNPP contract is simply not at issue, even though proof of the Republic's claim may show that the contract was illegal. Similarly, proof of the Republic's claims will presumably show that President Marcos violated the statutory prohibitions against bribery, but the only issue this Court need decide is whether the defendants violated these laws (thus giving rise to civil liability). *See* Sangco Aff., ¶ 7. Thus, "[n]othing in the present suit requires the court to declare invalid, and thus ineffective . . . the official act of a foreign sovereign." *Tectonics*, 110 S.Ct. at 704.[24]

■ Moreover, even if this Court were required to pass on the validity of an action taken by the Marcos regime, "the policies underlying the act of state doctrine may not justify its application," because "the balance shift[s] against application of the doctrine . . . if the government that committed the 'challenged act of state' is no longer in existence." *Tectonics*, 110 S.Ct. at 706.

> Once deposed, the dictator will find it difficult to deploy the defense successfully. . . . *A fortiori*, when a ruler's former domain has turned against him and seeks the recovery of what it claims he has stolen, the classification has little or no applicability.

*Republic of the Philippines v. Marcos*, 862 F.2d at 1360–61.

## IV. DAMAGES.[25]

■ The Republic seeks the following damages for its claims: (1) the amount of any bribes paid, both in the form of the SSR commissions, and the revenues and profits of the subcontractors who allegedly participated in the bribery scheme; (2) the defendants' revenues and profits; and (3) punitive damages. The Republic has set forth the opinions of two legal experts to demonstrate that these damages would be allowable under Philippine law. *See* Sangco Aff., ¶¶ 16–24; Yorac Aff., ¶ 16. The Republic has also set out several American cases which also hold that these damages would be available for bribery claims. *See* Republic Br. at 144 n. 79. The defendants do not appear to dispute that the damages sought are available for the Republic's claims; in any case, they cite no authority under Philippine or American law to the contrary.

Nonetheless, the defendants argue—virtually without the benefit of any legal authority—that the Republic's damages should be limited to the amount of the bribes received by President Marcos. Defendants begin their argument with the contention that the Republic is seeking "to be reimbursed for all monies it ever spent relating to the PNPP Contract and the construction of the plant." Westinghouse Br. at 111. But this is incorrect. As the Republic clearly states in its brief, it is *not* seeking "amounts spent on subcontractors not involved in the bribery scheme ($183 million), the Ebasco consultancy ($38 million), the bulk of nuclear fuel ($50 million),

**24.** *But see supra* notes 11, 21. Defendants again argue that this Court must decide "the efficacy of Marcos's acts in establishing a revolutionary form of government" because this supposedly affects whether President Marcos owed the Philippines a fiduciary duty. However, as I have already explained, I may assume President Marcos' government was legitimate, because that government never repealed the statutes which give rise to the Republic's claims here.

**25.** After this opinion was filed Westinghouse moved for reargument of its motion to the extent it sought summary judgment declaring the measure of compensatory damages. The court granted the motion to reargue and in an unpublished opinion held that in all the circumstances of this case, including the fact that the Republic's principal claims arising out of the PNPP contract are subject to arbitration, damages on the Republic's Count 3 and Count 8 bribery counts must be limited to the amount of the bribes paid and possibly punitive damages. The court stated in its unpublished opinion, "[t]o the extent that my September 20, 1991 opinion suggested otherwise, it was in error and is hereby modified in accordance with this opinion."

NPC's engineering and administration ($21 million), or guaranty fees and other miscellaneous items ($60 million). The Republic is also no longer seeking, in this Court, interest paid on the project ($1.35 billion)." Republic Br. at 143 n. 78.

Having grossly inflated the damages sought, defendants proceed to argue that awarding anything beyond the bribes received by President Marcos will somehow violate this Court's order staying all contract claims in this action. Why this is true is simply a mystery. As noted, the damages sought—the bribes, the revenues and profits, and punitive damages—are the kind of damages legally relevant to the Republic's remaining claims, and defendants have not even argued, much less demonstrated, anything to the contrary.

 Defendants also contend that allowing the aforementioned damages will somehow violate a discovery order this Court previously entered. But, as the Republic correctly points out, that order limited discovery, but it did not limit damages in any way. Nor is there any merit to defendants' belief that they will somehow be prejudiced because they have been unable to take discovery related to the Republic's damage claims. The only issue defendants claim they need further discovery on is the value of the PNPP plant. But this is plainly irrelevant to the Republic's damage claims, for the defendants simply are not allowed under the law to receive any offset for the value of their performance. The defendants also appear to argue that they will be prejudiced because they failed to seek relevant discovery in reliance on a more limited theory of damages. However, as the Republic points out, Westinghouse *did* take discovery on compensatory damages beyond the amount of the bribes.

Finally, defendants argue that the act of state doctrine again precludes an award of damages beyond the amount of the bribes. As explained at length above, *see supra* at 1465–66, the act of state doctrine is not at issue in this case because nothing requires this Court to pass upon the legality of the PNPP contract.

## CONCLUSION

For the foregoing reasons, I conclude that the Republic has stated cognizable claims under Philippine law, the claims are not time barred, there is sufficient evidence of bribery to withstand a motion for summary judgment, and there is no basis for defendants' proposed limitation on damages. Accordingly, the defendants' motion for summary judgment is denied in its entirety. An appropriate order follows.